BENJAMIN LILLARD et al.

*v.*

THE OIL, PAINT AND DRUG COMPANY et al.

[Decided Octóber 31st, 1903.]

1. A court of equity has the power to review the question of the reasonableness of salaries for the personal services of directors as corporate officers, though fixed by the stockholders, especially where the salary was fixed by the vote of the director as a majority stockholder for his own benefit.

2. The permanent annual salary of the president and manager of a corporation was fixed in 1895 by resolutions or by-laws, and was paid to 1900. In 1900 a minority stockholder filed a bill to secure relief against the salary on the ground that it was excessive, and claimed reimbursement from the time the salary was fixed. In 1896 complainant, as a member of the board of directors, endeavored to secure relief, but without success, and made like efforts at a stockholders' meeting in July, 1898. Since July, 1898, no meetings of the corporation stockholders have been held. After 1895 negotiations for the sale of the minority stockholder's stock took place between him and other stockholders.—*Held*, that complainant's relief could not, because of his laches, extend further than the setting aside of the resolutions fixing the .salary, with an accounting for any excess of salary received for the year commencing next after the filing of the bill up to the hearing and submission of the cause.

3. The question of the reasonableness of the compensation for services as manager of a corporation depends on what the services of a competent manager are reasonably worth, and not on what the manager could make in a different business. Evidence examined and salary held excessive.

4. *P. L. 1896 p. 293 § 47*, providing that the directors of every corporation created under the act shall, after reserving over and above its capital stock paid in as a working capital for the corporation such sum as shall have been fixed by the stockholders, declare a dividend among its stockholders of the whole amount of its accumulated profits exceeding the amount as reserved, gives to the stockholders discretionary power to fix the amount reserved, and so long as the capital reserved is retained for the benefit of the whole corporation, equity will not interfere.

5. Where a stockholder of a corporation sued in its behalf to recover salaries paid certain officers in excess of the amount to which they were entitled, and on other grounds, and recovered an amount as having been illegally paid as salary, but failed to substantiate the other charges of the bill, he was entitled to receive out of the money recovered a reasonable amount for counsel fees, but not the whole of his counsel fees and disbursements.

Heard on bill, answer and amended answer, replication and proofs.

*Mr. Flavel McGee* and *Mr. Robert L. Lawrence,* for the complainants.

*Mr. Charles L. Corbin* and *Mr. H. M. Brigham* (of the New York bar), for the defendants.

EMERY, V. C.

This is a stockholders' bill filed against three corporations and their several directors (other than one of the complainants), bringing in question the general management of the corporations by the defendant directors, and two specific acts—the reservation of working capital and the payment of excessive salaries to one of the defendants—are attacked as illegal and fraudulent. This reservation of working capital and payment of excessive salaries are also the facts principally relied on at the hearing to sustain the charge of fraudulent management of the companies, it being insisted that the general purpose of the defendants' management of the company has been to reduce its profits and dividends for the purpose of lessening complainant Lillard's income and compelling him to part with his stock at a loss.

In relation to these specific charges, which are the principal matters for determination in the cause, the relief sought is the distribution among the stockholders, as dividends, of the working capital alleged to have been wrongfully reserved, the setting aside of the by-laws and resolutions fixing the salaries, and the repayment by the defendant Allison to the treasury of the companies, of so much of the salary received as is in excess of a fair compensation. Two of the defendant companies—the Oil, Paint and Drug Publishing Company and the Druggists' Circular—are corporations of this state, and each of these companies is engaged in the publication of a trade paper, while the third company is not engaged in the business of publishing, but holds substantially all of the stock of the New Jersey companies. This holding company was incorporated under the laws of West

Virginia and is called the Oil, Paint and Drug Company. For convenience, I will designate the companies as the West Virginia Company, the Drug Publishing Company and the Druggists' Circular. The Drug Publishing Company publishes a paper entitled "The Oil, Paint and Drug Reporter," and the Druggists' Circular publishes a paper called "The Druggists' Circular." The entire capital stock of the Drug Publishing Company ($50,000) is five hundred shares of $100 each, of which the West Virginia Company holds four hundred and eighty-five shares; the complainant Benjamin Lillard, four shares; the complainant Mrs. Lillard, one share; the defendant Allison, eight shares, and the defendants Bell and Mrs. Allison, one share each. The capital stock of the Druggists Circular is $25,000 (two hundred and fifty shares of $100 each), of which the West Virginia Company holds two hundred and thirty-five shares, the other fifteen shares being held by the same parties, and to the same amount as in the Drug Publishing Company. The complainant Mrs. Lillard is a stockholder only in the New Jersey companies. The West Virginia Company was incorporated August 28th, 1890, and, although incorporated for the purpose of manufacturing books and periodicals, has never as yet carried on that business, or any business other than such as is purely incident to that of a holding company. Its entire capital stock was $750,000 (one-third preferred and two-thirds common), and of this the complainant Benjamin Lillard received two thousand five hundred shares (eight hundred and thirty-three shares in preferred and one thousand six hundred and sixty-seven common), and the defendant Allison five thousand shares. Two hundred and twenty-seven shares of complainant Lillard's preferred stock and four hundred and fifty-four shares of common stock were received by Lillard in exchange for one hundred and fifty shares of stock (par value, $15,000) which he then held in the Druggists' Circular, while for the balance of his stock (six hundred and six preferred and one thousand two hundred and thirteen common) Lillard gave his notes to Allison for about $90,000, upon receiving the stock. These notes have since been paid, mainly, if not altogether, out of the dividends declared by the West Virginia Company, the

source of these dividends being the dividends received from the New Jersey companies. Lillard, who has always been and still is a director of the West Virginia Company, was vice-president and general manager of this company, and in this capacity personally managed the business of both New Jersey companies connected with the publications from the time of its incorporation (August, 1890) up to about September, 1893, at a yearly salary of $7,800, without any further compensation from either of the New Jersey companies, nor did any other person receive any salary from the New Jersey companies for the management of their business. This salary was fixed by a resolution of the board of directors of the West Virginia Company. From September, 1893, to March, 1895, defendant Allison, as the president of the West Virginia Company, and Lillard, as vice-president and general manager of that company, together managed the business and publications of the New Jersey companies, each receiving $5,200 yearly from the West Virginia Company, but no salary from the New Jersey companies. These salaries were fixed by a resolution adopted by vote of the stockholders of the West Virginia Company, at a meeting in January, 1894.

In March, 1895, previous to the meeting of the stockholders of the West Virginia Company, an arrangement was made between the defendant Allison, who owned and held in his own name the majority of the stock of this company, and Mr. John L. Riker, who held three hundred shares of its stock and was a director of the company, that the defendant Allison should assume charge of the management of the business of all the companies for a salary of $18,000, and the further arrangement was made that this salary should be equally divided between the three companies. Allison and Riker controlled the West Virginia Company, which in turn controlled both the New Jersey companies, and the arrangement was formally carried into effect as follows: By the existing by-laws of the West Virginia Company (article 21) there could be no compensation for services rendered by the president or any director unless it was allowed by the stockholders, and previous to this time no salary had been given to the president. The by-laws directed (article 23) that the president should have general charge and super-

vision over the business of the company, but up to this time this general charge had not been taken to include services as general manager of the company, having charge, as such, of the entire business of the publications carried on by the New Jersey companies. Article 12 of the by-laws provided that the board of directors should have the management and control of the affairs and business of the corporation, and should appoint such officers and agents of the corporation as they might deem proper, and prescribe their duties and compensation, the officers and agents to hold their places during the pleasure of the board; and article 18 required the board to choose one of their members president, and that they should choose also a vice-president, treasurer, a secretary and a general manager, any director being authorized to hold more than one of these offices. At a meeting of the board held September 3d, 1890, Lillard was elected vice-president and general manager; and by the vote of the directors (other than himself) the salary for his services as such was fixed at $7,800 per annum, and by a subsequent resolution of the board, passed December 4th, 1890, it was resolved that he should receive this salary of $7,800 as vice-president and general manager, for the term of three years, from September 1st, 1890, and he was yearly elected by the board as vice-president and general manager, his last election being on January 23d, 1894, and for the ensuing year. At a meeting of the stockholders of the West Virginia Company held March 19th, 1895, a resolution was passed that the company pay to its president, as compensation for his services, a salary of $6,000 per year. This was passed by the votes of Allison, holding a majority of the stock (three thousand seven hundred and eighty-nine shares); Mrs. Allison, his wife, eight hundred and fifty shares; Riker, three hundred shares, and thirty-five shares by defendant Bell, Lillard voting two thousand five hundred shares against the resolution. Allison was then elected president at the directors' meeting following the stockholders' meeting by the unanimous vote of the five directors, Allison, Hewitt, Riker, Bell and Lillard, and was also, by the same vote, elected general manager of the company for the ensuing year. At this fixing of the president's salary no addition to his previous duties was

made either by the stockholders or directors; neither was there any provision by either stockholders or directors that, as compensation for this salary thus permanently fixed at a large sum by the by-laws of the company, the duties of general manager of the business, either of the West Virginia Company or of the New Jersey companies, should be included, either wholly or in part, as the duties of the president of the West Virginia Company.

The status of the New Jersey companies in reference to the change was as follows: The by-laws of the Drug Publishing Company directed that the directors should appoint and might remove at pleasure all officers, agents and employes of the company, prescribe their duties and fix their compensation, and it was made their duty (article 4, section 10) to conduct, manage and control the business of the company. They were to elect annually one of their members president, who should have, subject to the advice of the directors, a general direction of the affairs of the company. The by-laws could be amended by the affirmative vote of three-fourths of the stockholders at a meeting, or by all the directors at any regular meeting or meeting specially called.

On July 6th, 1891, after the purchase of the stock of the company by the West Virginia Company, Allison was elected president and publisher, and Lillard vice-president and manager, for the ensuing year, and each was re-elected annually to these offices until July, 1894, when Allison was elected treasurer, and Lillard vice-president, for the ensuing year. Up to July, 1895, neither Allison nor Lillard received any compensation as publisher or manager of the company. In reference to the other New Jersey company, the Druggists' Circular, the same condition of affairs existed, except that the by-laws of the latter company could be amended by a majority vote of the stockholders.

On July 1st, 1895, at a meeting of the directors of the West Virginia Company, Mr. Henry M. Brigham, the New York attorney of the company, was made its proxy at the annual meetings of the two New Jersey companies, and was directed to vote for Allison and his wife and the defendant Bell as di-

rectors of those companies, and was then, by the same resolution, further directed to vote at these meetings in favor of an amendment of the by-laws of each of the New Jersey companies which should provide that the salary of the respective presidents, from and after the 1st of July, 1895, should be $6,000 per annum. This resolution was passed by the vote of all the directors of the West Virginia Company except Lillard, who opposed it. These resolutions of the West Virginia Company board were carried out at the annual meeting of the two New Jersey companies held on July 3d, 1895, and their by-laws were so amended, Lillard voting against the resolution at each meeting of the stockholders. Mr. Allison, his wife and Mr. Bell were elected as the three directors of the New Jersey companies, and Mr. Allison, at the subsequent meeting of the directors of each of the New Jersey companies, was elected president, treasurer and publisher of each company, and was re-elected in July, 1896. Since that date he has not been elected to these offices in the New Jersey companies by the directors of either of those companies, so far as appears by their minutes. Under the Corporation act, section 13, the president and treasurer continue in office until others are chosen. In 1896 Allison was, by the directors of the West Virginia Company, elected president and appointed general manager of that company, and since that time has apparently held both these offices and his offices in the New Jersey companies without any further election or appointment by either stockholders or directors. For services in all the offices he has received the aggregate salary of $18,000, each company paying $6,000. The proofs show that since the passage of the resolution and amended by-laws, Allison has for these salaries actually rendered all or most of the services in the management of the publications formerly performed by the general manager of the West Virginia Company and the publishers and managers of the New Jersey companies. There have been no meetings of the stockholders of the West Virginia Company since January, 1896, or of the New Jersey companies since July, 1898, and Mrs. Allison having died in 1899, Allison and defendant Bell have acted as the only directors of both New Jersey companies since that date.

The first question raised in reference to the salary is the right of the court to consider or review the question of their fairness or reasonableness, it being claimed that inasmuch as the salaries have been fixed by the by-laws or resolutions of the stockholders themselves, this action is final and conclusive upon all stockholders and upon the court.

It is settled in this state beyond question that where the salary of the president or of any other member of the board of directors, for his personal services in the general management of the business of a company of this character, is fixed by the directors, the amount of compensation fixed by the board is not final as against any dissentient stockholder promptly applying for relief. The mere employment of a director to perform the services is not reviewable to any greater extent than any other act of the board in managing the business of the corporation under the statute, but the agreement for employment is in such cases considered as distinct and separable from the agreement for compensation, and the compensation, when properly called in question, is determined by the court, at its fair value, and the burden of establishing the value of their services is upon the directors. *Gardner* v. *Butler, 30 N. J. Eq. (3 Stew.) 702 (Court of Errors and Appeals, 1879)*, and *Fougeray* v. *Cord, 50 N. J. Eq. (5 Dick.) 185; 'S. C. on appeal, 50 N. J. Eq. (5 Dick.) 756, 759 (1892)*, are adjudications expressly upon this point of salaries or compensation for services in the management of the ordinary business of the company where the salary was fixed by the board of directors, and in each of these cases the review of the compensation was made at the instance of a single stockholder of a solvent going corporation to compel repayment of excessive compensation fixed by directors. *Hayes, Receiver,* v. *Pierson (Vice-Chancellor Stevens, 1899)*; *affirmed on appeal, 45 Atl. Rep. 1091*, was a suit by a receiver of an insolvent corporation, in which all of the stockholders, except one holding three shares, had assented to fixing $4,000 as the salary of the president, who managed the entire business of the company. This compensation, as appears from an examination of the record on appeal, was fixed by the stockholders at a stockholders' meeting, and the point was raised on appeal that the

company and the receiver were bound by this action. But the compensation was reviewed and set aside as excessive by the vice-chancellor, and his decision was affirmed on appeal. In *Davis* v. *Thomas & Davis Co., 63 N. J. Eq. (18 Dick.) 572 (Vice-Chancellor Reed, 1902)*, repayment of excessive salary was directed on a bill by a receiver representing only the creditors of an insolvent corporation, and on the ground that it was a misappropriation of the assets. It does not appear in the report of this case whether the stockholders fixed or approved the salary, or whether it was fixed by the directors. The contract for compensation of a director, like any other contract made by the board in which a director is personally interested, is a contract which is voidable but not void, and may therefore be ratified. Such contracts are voidable, however, as against the company, considered as composed of the whole body of stockholders, not voidable against each stockholder in his own individual right, and the general rules established as to affirming or ratifying such voidable contracts are (1) that the stockholders, as a body, may, <u>by a majority</u> vote, ratify the contract, and (2) that as the individual stockholders are not trustees for each other, the director whose contract is in question may vote as a stockholder on the ratification, and that the ratification is valid, even if his vote is necessary to make the majority. These general rules were recognized and approved in *Hodge* v. *United States Steel Corporation, 64 N. J. Eq. (19 Dick.) 807 (Court of Errors and Appeals, 1902)*. They were there applied to the case of the approval of a contract, in which a majority of the directors were interested, which was not in the ordinary or usual course of management of the business, but was a contract for compensation to directors and others for special services and guarantees connected with the conversion of two hundred thousand shares of the preferred stock of the company into bonds. In this case, also, the by-laws of the company, adopted before complainant purchased his stock, expressly provided for the approval, by a majority vote of the stockholders, of any contract which the directors desired to submit to their approval, and the contract was approved under this by-law.

In the present case there are no provisions, either in the charter or by-laws, limiting the power of the board of directors

or increasing the power of the stockholders in the management of the ordinary business of the company, and the compensation which is questioned in this case was fixed directly, and in the first instance, by the stockholders, either by resolution or by-law. Our statute (*Corporation act,* § 12) provides that "the business of every corporation shall be managed by its directors," but it also provides (*Corporation act,* § 1) that the corporation "may make by-laws providing for the management of its property and the regulation and government of its affairs," and (section 8) that the certificate of organization may contain provisions limiting and regulating the powers of the directors and stockholders, if they are not inconsistent with the act.

The regulation of official duties and the salaries therefor is a proper subject of by-laws within the power of stockholders under the statute, and although it may be doubtful whether the stockholders, against the consent of the board of directors, have the power under our statute to direct the employment of the agents to manage the ordinary business of the company outside of the official duties, and fix their compensation for such service, there would seem to be no question that, in the absence of statutory or charter provisions to the contrary, the stockholders, as a body, must have the general power to direct or ratify the employment of a director for that purpose and fix the compensation. Otherwise the corporation might not be able to employ any director as such agent against the objection of any stockholder.

In reference to the power of stockholders, the general rule is declared to be that where there is no statutory or other provision regulating the constitution and powers of the managing body, the majority of the stockholders must determine how its affairs are to be conducted, and to whom and under what restrictions the management of those affairs shall be entrusted. *Lind. Comp.* (*5th ed.*) *298.* The exercise of this right of the majority of the stockholders, either to originally direct or to affirm a contract between the company and a director or directors personally interested in the contract, is not, however, absolute and unqualified, but is subject to a necessary qualification declared in *North-*

*west Transportation Co.* v. *Beatty, L. R. 12 App. 589 (Jud. Council, 1887)*, the leading English case, in which the general power of the stockholders was affirmed. This qualification is (*Northwest Transportation Co.* v. *Beatty, L. R. 12 App. 593, 594*) that the affirmance or adoption must not be brought about by unfair or improper means, and must not be illegal or fraudulent or oppressive towards those stockholders who oppose it. As was said in a later case, *Menier* v. *Hooper's Telegraph Works, 9 Ch. App. 353 (1874)*, the majority of the shareholders, although they may deal with the assets of the company, cannot so deal with them as to divide the assets, more or less, between themselves, to the exclusion of the minority.

The fixing of his salary by the sole vote of the majority stockholder in his own favor is, in effect, an appropriation of the assets to his own use, and under this necessary qualification or limitation of the power of the stockholders it is subject to the review of a court, when properly questioned, and if fraudulent or oppressive should not be allowed to stand. This protection to the minority stockholder, in relation to contracts for services between the company and a director who is also a majority stockholder, is not only equitable and just, but is, in my judgment, vital to the usefulness of the system of corporate management. In the *Hodge Case* the contract (which had been previously considered in the *Berger Case*) was held not to be fraudulent or unreasonable, and while it is true that the court declined to review the question of alleged excessive amount of compensation under the contract, or to reserve the consideration of this question for the final hearing, as I had done when the cause was before me, it must be noted that the contract was a special contract with the directors and third persons, and may therefore have been considered as a voidable contract which was to be affirmed or rejected *in toto,* both as to the services and compensation of the directors as well as the third persons. It was not, as in the present case, a transaction merely between the company and a director for the management of the company's ordinary business which must be carried on, and one in which, as our decisions have uniformly held, the employment and the compensation are justly and properly separable contracts between

the company and the director. In *Hayes, Receiver,* v. *Pierson, supra,* the compensation fixed by the stockholders as the salary of one of its officers was reviewed by the court, and the case is an adjudication in favor of this right of review, although the point was not specially considered in the opinions. In respect to the burden and amount of proof, the status of the opposing stockholder may in some cases be different when the majority of the stockholders, and not merely the board, direct or approve the compensation or salaries, and instead of requiring the director to prove that the compensation is fair—our rule where the board fix the salary—the objecting stockholder may be required to establish affirmatively that the salary or compensation fixed by the stockholders is unreasonable and oppressive.

If the method of fixing the annual salaries of its officers for the performance of official duties and the management of the company's business is by an alteration of the by-laws instead of a contract with the company through the directors, and directed or approved by the stockholders from time to time, then the power of the majority stockholder to fix his salary, either as officer or agent of the company, by his sole vote, is not so broad. This results from the fact that by-laws are the permanent regulations of the business of the company, intended for the common benefit of all the stockholders, and however widely the powers of alteration may be given, either by the statute or articles, these powers must, in the words of Master of Rolls Lindley, in *Allen* v. *Gold Reefs of West Africa (1900)*, *1 Ch. 656, 671,* "be exercised subject to those general principles of law and equity which are applicable to all powers conferred on majorities and enabling them to bind minorities. It must be exercised, not only in the manner required by law, but also *bona fide,* for the benefit of the company as a whole, and it must not be exceeded. These conditions are always implied and are seldom, if ever, expressed." The same principle would apply to permanent regulations in the form of resolutions of the stockholders. Under the evidence in this case, I have no doubt that the resolution and the alterations in the by-laws of the respective companies were not made *bona fide* with a view to common benefit of the company as a whole, but for the purpose of securing to the director who controlled

the appointment to the office, and making permanent as long as he controlled the stock, an arrangement for compensation in the offices which, in the usual and ordinary course of management of the business for the common benefit, would have been within the control of the directors elected from time to time, according to their judgment, as the business or exigencies of the company might require, subject to review from time to time by the stockholders. This form, therefore, of fixing a director's salary by his own vote or control, on an alteration of by-laws or general resolution, not only did not give an additional sanction against an existing minority stockholder, but required on the part of the majority stockholder the exercise of a good faith toward the interests of the company, considered as a whole, which might not have been required of him as a stockholder voting upon a contract for compensation between the company and himself, which was to be renewed or approved yearly or from time to time by the directors, and, if they desired, to be submitted to the stockholders. These alterations of the by-laws and the resolution in fixing the salaries of the presidents of the companies made no addition to their official duties, which up to this time did not include the personal management of the business of publishing, which had been under the control of agents called the general manager or publishers, and if these large salaries are merely and strictly salaries for official duties under the existing by-laws, they are manifestly misappropriation of the company's funds for the sole benefit of the director. The only theory upon which they can be retained by the defendant Allison is that they were in fact intended as compensation, to be given mainly, if not altogether, for the performance of the duties of general manager or publisher of the papers. These duties had been previously performed by agents approved by the directors, who fixed the compensation, and in the absence of any alteration or addition to the by-laws attaching these duties of general manager or publisher to the office of president, the services must perhaps strictly be considered as performed under an implied contract with the company, made with the directors. In either aspect of the case, therefore, whether the duties of the presidents assumed after the

14

alterations be taken to include the duties of manager and publisher, and the salaries therefor be taken as fixed by by-law or resolution, or whether the services as manager or publisher after the alterations be considered as performed under implied contracts with the companies, made with their directors, I conclude that the fairness and reasonableness of the salaries can be reviewed by the court.

If the court has the right, in a proper case, to review the action of the stockholders or directors in fixing the salaries, the objection is next made that this right is not to be exercised in this case because of the complainants' laches in applying for relief. The salaries were fixed in 1895, and have been paid since that time, and the bill was filed in March, 1900.

In July, 1896, Lillard, as a member of the board of the West Virginia Company, endeavored to secure relief against the salaries, but without success, and like efforts were made by him at the stockholders' meetings of the New Jersey companies held in July, 1898. Since July, 1898, no meetings of the stockholders of either of the New Jersey companies have been held, and the stockholders of the West Virginia Company have held no meeting since January, 1896. The directors in office continue, under the respective charters, until their successors are elected.

After defendant Allison took charge negotiations or conferences took place in reference to the sale of Lillard's stock, and the pendency of these is an explanation, to some extent, of the delay in filing the bill. Promptness in a stockholder's application for relief in a case of this kind is one of the essential conditions on which it is granted, and the question in each case is as to the application of the rule. Where the contract or act complained of is one which relates to separable annual payments, but is continuous in its operation, and the illegality or oppression will be permanent, unless it is set aside or restrained by the court, delay may not be a bar to relief against the continuance of the salaries, although it may bar a recovery of the excess paid previous to the time of filing the bill. Delay is made effective as a bar to relief mainly upon the ground of acquiescence, but acquiescence in one illegal act, or invalid act,

should not be held to bind the stockholder to submit to a continuance of similar illegal or invalid acts. The office of president of these companies is an annual office, and the salaries are payable yearly, and the minority stockholder's substantial grievance here is that the salary claimed to be excessive is attached permanently to the office by means of by-laws and stockholders' resolutions, and that this annual salary to the presidents cannot be terminated at all, except by the consent of the majority stockholder, who holds the office at his will. So far as relates to the salary paid each year, the stockholder may be barred from relief, if he delays beyond the year, and allows the company to pay the salaries, and the delay is not satisfactorily explained. But if the by-law or resolution is invalid, he is entitled to relief against its continuous operation, as fixing permanently the salaries of the presidents for the future. In the present case, I do not think the delay to take proceedings for relief against this salary has been satisfactorily accounted for. Disputes and contentions arose at once between Lillard and the defendant directors in regard to the general management of the company from the time he ceased to be manager, and these continued up to the time of filing the bill, there being, in the meantime, negotiations or conferences in regard to the sale of his stock to the defendants, or one of them. Complainant's hope or expectation of a settlement through such sale explains his delay in commencing this suit, which involves the whole general management of the companies' affairs under the defendant Allison, including the matter of the alleged excessive salaries, but so far as the objection to the salary already paid is concerned, this is not a sufficient legal excuse for the delay in applying for a relief. The salary paid to Allison as president of the West Virginia Company was brought to Lillard's attention regularly since 1898, on his attendance at the meetings of the board of directors, of which he was a member, and so far as the payment of this salary was concerned he made no objections after 1896. Complainant's relief in regard to the salaries, if he is entitled to any, being based on his rights as a stockholder of the company, cannot extend, therefore, further than the setting aside of the resolutions and by-laws, with an accounting for any excess

received for the year commencing next after the filing of the bill up to the time of the hearing and submission of the cause. If a recovery of the excessive salaries is sought by a receiver, representing creditors, and following assets which have been misappropriated by directors for their salaries, other considerations may be applicable to the effect of delay.

As to the amount of salaries, my conclusion upon the whole evidence is that the compensation of $18,000 is excessive, by at least $5,000. In the preliminary arrangements for Allison's compensation, the entire services in connection with all the companies were considered as embraced in this single sum of $18,000, which was to be equally divided among the three companies. The main question is as to the value of the services in managing and publishing the two periodicals, outside of the official services. The evidence as to the value of such services in the publication of other trade journals, so far as they can be a guide in this case, would not warrant the fixing of a larger sum than $10,000 a year. This evidence is produced by complainants, and the defendants, on their part, have not attempted to sustain this claim by any evidence of this character, but claim that it should not be given any weight, because, as is insisted, the management of each of such publications depends on its own peculiar conditions. For the official services as president and treasurer of each company, anything over $1,000 for each company is excessive.

Defendant's claim that the salary of $18,000 is reasonable and fair, although the same services had been previously rendered to the company for about half that sum, is based mainly on the contention that the defendant, at the time of assuming the management, was making as much or more in other business, and the conclusiveness of the previous smaller salary paid is answered, or attempted to be answered, by the contention that the profits received by Lillard, through the receipts of which he paid for his stock, should be taken as really salary paid to him. Neither of these contentions is sound. The questions in relation to compensation are (1) what were the services of a competent manager fairly worth, and (2) were they in this case unreasonably excessive? The amount defendant was making in

another and entirely different business was undoubtedly a fair matter for his own consideration in determining whether he should give up his previous business and take charge of a business in which he and his wife owned substantially two-thirds of the stock, and which had been in the past very profitable to him as a stockholder, for a salary less than the profits of his business, but it is not, in my judgment, any fair basis or reason for requiring that the company or companies should, in the form of salary for managing their business, guarantee him the continuance of his profits in another business, whether his services to the companies were worth it or not. The argument that the payment of dividends to Lillard was really a salary, and together with his salary amounted to much more than Allison received as salary, and the latter's salary is therefore to be considered fair, is also unsound. This transaction was a purchase, for which Lillard gave his notes to Allison, and became his debtor. He owned before the purchase a large number of shares and the transaction as between Allison and Lillard was in all respects a purchase of the stock, and not an arrangement for salary. It was so considered and treated by both, and although the business under Lillard's management was so profitable as to pay the notes for the purchase largely out of his dividends on the stock purchased, Lillard took the risk when he gave the notes that they might not be paid out of the profits, and Allison derived his proportionate benefits as stockholder by the dividends received on his stock under Lillard's management. The payment of Lillard's notes from this source is not now to be considered as a salary or as justifying Allison's sure return, in the form of a large salary for management, of a sum approximating or proportioned to the dividends Lillard received on his stock while manager. I conclude that the amount of salary must depend primarily upon the value of the services of a competent manager, and tested either by the previous salaries of the companies, the salaries generally prevailing in the trades, or the actual results of a number of years under defendant's management, as compared with the previous management under Lillard, I conclude, under all the evidence in the case, that the combined salaries of $18,000 are excessive. The resolution and by-laws

of the respective companies, fixing the salaries of the respective presidents at $6,000, must all be set aside as invalid. For the purpose of determining the amount paid in excess, for which the defendant should account in this suit, the setting aside should take effect on July 1st, 1900, the expiration of the current salary year, during which the bill was filed (March, 1900), and the accounting should run to the end of the current salary year, during which the cause was heard and submitted—that is, to July 1st, 1902. Whatever salaries defendant received after the filing of the bill he took subject to any decree of the court up to the time of the hearing, and relief to this extent is incidental to setting aside the resolution and by-laws. The allowance for services for the years subsequent to the hearing and submission depends, or may depend, upon evidence not submitted in this cause, and any adjudication upon this point should be reserved. In my judgment, $13,000 per year would be full and ample compensation to be allowed for the defendant's entire services to all three companies—$10,000 for services as manager and publisher and $3,000 for the official salaries—$1,000 for each company. Defendant must account for all received over that amount of $13,000 during the two years, July 1st, 1900, to July 1st, 1902, being $10,000 of the whole salaries which have been received. As to the company or companies to whom the excess should be repaid, my present view is that for the purposes of this adjustment the $6,000 paid yearly by the West Virginia Company should be first applied to the payments made —$1,000 for the official services as president and $5,000 for services as general manager of the West Virginia Company— and that $7,000 yearly be then applied equally between the two New Jersey companies upon the amounts respectively paid by them, being $1,000 for official services and $2,500 for services as publisher in each company. The amount to be reimbursed to each New Jersey company on this basis will be $5,000. I make this adjustment because the salary of the general manager of the West Virginia Company was from the beginning, and up to March, 1895, paid for the personal management of the publications, which were actually made by the New Jersey companies and its officers and agents, and was the only source of

salary; and further, because on making the change now brought in question the first source of payment indicated was the $6,000 from the West Virginia Company, the similar amounts from the New Jersey companies not being fixed until about four months later. For the purpose of adjustment between the three companies it seems equitable, therefore, that the excess should be considered as made by the later action of the New Jersey companies. As this point was not spoken to at the hearing, I will hear counsel, if desired, on application of either party.

In reference to the reservation of working capital, the facts are that at a special meeting of all the stockholders of the Drug Publishing Company, held in October, 1897, they passed a resolution that the sum of $20,000 be retained out of the surplus earnings of the company as working capital. The resolution was passed by a vote of four hundred and ninety-five shares (four hundred and eighty-five of the West Virginia Company) to five shares of the complainants. On the same date a similar resolution was passed at a meeting of all the stockholders of the Druggists' Circular by a vote of two hundred and forty-five shares against five. The West Virginia Company voted two hundred and thirty-five shares in the affirmative. It is contended that these reservations were illegal and invalid because the motive of them was to lessen the income from dividends to the shares of the West Virginia Company for the purpose of injuriously affecting or depressing the value of complainant Benjamin Lillard's holdings in the shares of that company. At these meetings of stockholders of the New Jersey companies the vote of the West Virginia Company upon its shares was cast by Mr. Brigham, as its proxy, and he was appointed such proxy by a resolution of the board of directors of the West Virginia Company, held on October 6th, 1897, Mr. Lillard being present and voting against the resolution. Instructions were given in the resolution as to the proxy's vote for directors of the New Jersey companies, but not upon the subject of the reservation of working capital. Nor does there appear to have ever been any formal action by the board of directors of the West Virginia Company upon this question. At the time of this reservation of their

working capital the law in force was the Corporation act of 1896. Section 47 of this act (*P. L. 1896 p. 292*) provided that,

"the directors of every corporation created under this act shall (at certain times fixed), after reserving over and above its capital stock paid in as a working capital for said corporation such sum, if any, as shall have been fixed by the stockholders, declare a dividend among its stockholders of the whole amount of its accumulated profits exceeding the amount so reserved, and pay the same to such stockholders on demand."

Before the passage of this act the amount to be reserved for working capital (up to one-half of the capital stock paid in) was to be fixed by the directors. The power given to the stockholders, under the act of 1896, to fix the amount reserved is absolute, and it is discretionary. So long as the capital reserved is retained for the benefit of the whole company, and not distributed to the majority stockholders at the expense of the minority, I see no reason to interfere with or question the action of the majority of the stockholders in this case because of the supposed motive of reserving their own profits instead of dividing them. The complainants, therefore, are not entitled to any relief as to this reservation of working capital.

The general charges of mismanagement, outside of the two specific acts mentioned, have not been sustained by the proofs. Especially is this true as to the charges of misappropriation of moneys. The accounts and books of the companies have not been kept in as complete or satisfactory a method as its business requires, but the main defects are those which have arisen from continuing the system of bookkeeping which formerly obtained under Lillard, and at the hearing the defendants offered and proposed the introduction of a new and thorough practical system. I will hear counsel, if they desire, as to whether any order should be made in the suit in reference to the books. The complainant is entitled to costs. The examination of the books and accounts in court—very long and expensive—was necessary, and in view of the fact that no stockholders' meetings of any of the companies have been held since 1898, and complainant has been unable to obtain the information to which he was entitled as a stockholder without resorting to the courts, he is entitled to the

costs of the suit, including the costs made necessary by the examination of the accounts. A decree will be advised in accordance with these views, and the form of the decree will be settled.

[Decided June 11th, 1904.]

On subsequent application by the complainant for allowance of costs and counsel fee.

*Mr. Charles D. Thompson,* for the complainant.

*Mr. Charles L. Corbin,* for the defendant.

EMERY, V. C.

So far as complainant's taxed costs of suit are concerned, direction for payment by all of the defendants will be made. On the result of the trial of all the issues this is equitable. But inasmuch as complainant's action in relation to the salaries has resulted in a substantial benefit to the two New Jersey companies by the recovery for them of the amount paid in excess, and as this action was brought by complainant purely as a stockholder to protect the rights of the companies, he should not be compelled to bear the sole burden of its recovery, and is entitled to receive out of the moneys so recovered for the companies a reasonable counsel fee. *Meeker* v. *Winthrop Iron Co., 17 Fed. Rep. 48.* Upon consideration of all the circumstances of the case, I fix this counsel fee at $500. Having failed in all the charges of the bill except the one relating to salaries, complainant is not entitled to be made whole for all his counsel fees and disbursements in the suit. I have settled decree on this basis. In the taxation of costs complainant will be allowed for the sums paid stenographer for copies of the evidence, and special order to this effect will be made if necessary.