## ROGERS v. GUARANTY TRUST CO. OF NEW YORK et al.

## SAME v. AMERICAN TOBACCO CO. et al.

### No. 390.

Circuit Court of Appeals, Second Circuit.

June 13, 1932.

SWAN, Circuit Judge, dissenting.

See, also, 53 F.(2d) 398.

Richard Reid Rogers, of New York City, pro se.

Chadbourne, Stanchfield & Levy, of New York City, for appellees Hill, Riggio, Harvie, Boylan, and American Tobacco Co.

William M. Parke, of New York City, for appellee Taylor.

Davis, Polk, Wardwell, Gardiner & Reed, of New York City, for appellees Guaranty Trust Co. and Parker.

John W. Davis, Victor J. Dowling, George W. Whiteside, and J. Arthur Leve, all of New York City, of counsel, for all appellees.

Before MANTON, SWAN, and CHASE, Circuit Judges.

MANTON, Circuit Judge.

Appellant, a stockholder of 200 shares of common and 400 shares of common B stock of the American Tobacco Company, a New Jersey corporation, seeks by these suits, which have been consolidated, to enjoin the execution of an employees' stock subscription plan approved by the directors of the corporation on June 25, 1930, and by the stockholders on July 28, 1930. He has joined as defendants with the company, the Guaranty Trust Company, and Junius Parker, as trustees of 56,712 shares of the common B stock, and the directors of the American Tobacco Company. These shares of stock were distributed among the directors and 527 other employees of the corporation, and the relief sought is the cancellation of the shares issued.

Four defenses were interposed in the answer filed, and a motion to strike out such

defenses was made. The court, in the exercise of its discretion, declined to entertain jurisdiction of the bill for the reason that the corporation existed under the laws of the state of New Jersey and it held that the court of the domicile of the corporation was the forum to which appellant should appeal. The complaints were dismissed.

The American Tobacco Company has its principal office in New York City, where its chief executives are located and where its board of directors hold its meetings and keeps its corporate records.

The defenses which were sought to be stricken out are (a) that the appellant failed to comply with the provisions of Federal Equity Rule 27 (28 USCA § 723); (b) that the stockholders of the corporation, including the appellant, ratified the action of the board of directors in the allotments made to the members of the board under the employees' stock plan by re-electing them to the board, thus making them eligible for the benefits of the plan; (c) that, since the action is an attempt to regulate the internal affairs of a foreign corporation, the court below should decline to take jurisdiction; (d) that the amount of compensation paid to the individual appellees was and is fair and reasonable by virtue of the valuable services that they have rendered to the company, and, under the by-laws of the corporation, the directors have the right to fix the compensation of its agents, and the allotment under the plan was in accordance therewith as well as in accordance with the statutes of New Jersey.

At a meeting of the directors on June 25, 1930, in accordance with section 2, c. 175, p. 354 of the Laws of 1920 (Comp. St. Supp. § 47—184) they duly declared the advisability, and directed the submission, to the stockholders of a plan for the issuance and sale of its common B stock to employees and those actively engaged in the conduct of the business, by way of compensation for services to be rendered. Section 1, c. 175, of the Laws of 1920 (Comp. St. Supp. § 47—183), empowers a New Jersey corporation to provide and carry out a plan for the following purposes: "(a) The issue or the purchase and sale of its capital stock to any or all of its employees and those actively engaged in the conduct of its business or to trustees on their behalf, and the payment for such stock in installments or at one time with or without the right to vote thereon pending payment therefor in full, and for aiding any such employees and said other persons in paying for such stock by contributions, compensation for services, or otherwise." The stockholders met July 28, 1930, and passed two resolutions, one involving a change in the capital structure of the company, and the other authorizing the adoption of this stock subscription plan. The change in capital structure consisted in a decrease of the par value of the common stock and common B stock of the corporation from $50 to $25, and an increase of the authorized shares, in the case of common stock from one to two million shares, and in the case of common B stock from two to four million shares. The resolution also provided that the voting power of the preferred stock be increased from two to four votes in order to maintain the proper ratio. Each stockholder was to receive two shares of new stock, common or common B, for one share of old stock. There was outstanding on this date 526,997 shares of preferred stock, 778,548 shares of common, and 1,535,850 shares of common B stock. The plan was approved by a vote of 389,573 preferred, 620,268 common, and 1,220,855 shares of common B stock. There were voted against the resolutions 170 shares of common, 1,995 shares of common B, and 10 shares of preferred stock.

On January 28, 1931, the directors held a meeting which neither the president nor the vice president Penn attended. The board adopted a resolution providing that there be submitted to the president a number of employees who, in the opinion of the board, should be considered in the allotment of stock, together with a statement of the services rendered by each and with an estimated rating, on a percentage basis, of the value of the services to the company, as compared in each department with the key executive in such department, and the annual rate of compensation of each as of December 31, 1930, including all salary and other compensation of any kind. The board recommended that in determining the individual allotments under the plan there should be used as a general basis a number of shares of stock having an aggregate par value equal to 33⅓ per cent. of the amount of compensation paid or accrued to such individual for his services to the company for the calendar year 1930, and that, "in view of the unusual ability and efficiency of the President George W. Hill, particularly in connection with sales as well as the general oversight and supervision of all the activities of the corporation and its subsidiaries, and in view of the unusual ability and efficiency of the Vice-President Charles

A. Penn in connection with the manufacturing activities of the Company, this Board recommends that the said George W. Hill and Charles A. Penn be given recognition on the basis of 100 per cent. rating of the value of their services to this corporation, as indicated on the list hereinabove referred to."

As a result of the meeting, there was accorded to 535 employees, including directors who were active employees, the right to subscribe to a number of shares at $25 par value upon the terms and conditions described in an agreement between the company, the respective employees, and the trustees who were named in the agreement. Under the agreement, the stock certificates could not be delivered to the allottee until the purchase price, and all interest accrued thereon should be paid in full, and, in any event, should not be delivered to the participant until after December 31, 1931. If on or before that date the connection of any employee of the company should be severed by discharge, with or without cause, or by resignation, then the trustees had the power to cancel forthwith any right such employee had under the agreement for the delivery of the stock.

The American Tobacco Company, in 1912, by a decree of the United States Supreme Court, was ordered to disintegrate. United States v. American Tobacco Co., 221 U. S. 106, 31 S. Ct. 632, 55 L. Ed. 663. Those companies which were permitted to continue under the decree were estimated to have at that time 37.11 per cent. of the cigarette business in the United States. However, between 1912 and 1925, due to competition, the percentage dropped to 21.81 per cent. In December, 1925, the appellee, Hill, became president of the company. Under his management, and in co-operation with Vice President Penn and the rest of the board, most of whom were employees of the company, a new policy was inaugurated in all the departments. The result of the change of policy in the operation of the business made the American Tobacco Company the leader in the cigarette industry. In 1931 the total increase of sales over 1929 of cigarettes of all kinds in this country was approximately half a billion. The increase in the sale of the company's most popular brand, "Lucky Strike," was nearly six billions. The business is world-wide in scope, with many factories, branches, and organizations in all parts of this country. The company in 1930 expended $20,400,000 in advertising. In that year it sold 38.10 per cent. of the cigarettes produced in the United States. Its net earnings,

after deducting all charges for management and taxes, amounted to $43,294,769. It paid dividends on its common stock of $29,294,000 in 1930, with an extra dividend of $1 for the first quarter of 1931. The total dividends on the common stock for the latter year exceeded $28,300,000; on its preferred stock, $3,161,982. It paid the United States government taxes of $150,000,000 in 1930. These figures give some idea of the gigantic problem confronting those engaged in the active management of the company's affairs. It has had most unusual commercial success. The services rendered by the individual appellees have been extraordinary and unique.

On April 1, 1931, at a meeting of the stockholders, the directors were re-elected, indicating a renewed confidence of those in charge of the corporation. On January 28, 1931, it was publicly announced through the newspapers that the directors had voted to allot 56,712 shares of the company's common B stock, pursuant to the authority conferred upon them under the plan. On March 12, 1931, each stockholder of record received a statement relative to the plan showing the amount of shares allotted to the president and the five vice presidents, and specifying the amount allotted to the various 535 employees. The statement also advised the stockholders of the operation of article XII of the by-laws, which had been adopted by the company on March 13, 1912. See Rogers v. Hill (C. C. A.) 60 F.(2d) 109, decided this day. After this public notice, the meeting of April 1, 1931, was held. The appellant gave public notice of his opposition to the plan, inviting others to join him in such opposition, and at the meeting nominated a candidate for director against Mr. Hill. He voted for all the directors except Mr. Hill. The directors were re-elected by a vote varying from 2,608,201 to 2,615,973. The opposition candidate received 11,980 votes. There were at the time approximately 40,000 stockholders in the company.

Appellant argues (a) that the directors' participation in the plan made it illegal ab initio; (b) that under the plan the stock was issued for services to be rendered, and this is unlawful, because the stock of a New Jersey corporation can be lawfully issued only for the amount that such corporation actually paid for labor performed; (c) that the sale to the directors was for $25 per share, whereas the stock was selling on the exchange market for $112 per share.

As to (a), ample notice was given to the stockholders of the directors' participation

and their respective amounts. The New Jersey statute (Laws of 1920, c. 175, p. 354, § 1 [Comp. St. Supp. N. J. § 47—183]), quoted above, includes within its terms such a plan as was here intended and contemplated.

It has been long recognized that in corporate transactions, where directors have an interest, the stockholders of the corporation have full power to authorize and ratify their acts if the existence of an interest is disclosed. United States Steel Corp. v. Hodge, 64 N. J. Eq. 807, 54 A. 1, 60 L. R. A. 742; Pierce v. Old Dominion Co., 67 N. J. Eq. 399, 58 A. 319; Lillard v. Oil, Paint & Drug Co., 70 N. J. Eq. 197, 56 A. 254, 58 A. 188. When a contract is entered into by the stockholders with the directors, or the stockholders expressly authorize the directors to enter into a contract and the stockholders have notice of the directors' interest, the agreement is unassailable in the absence of actual fraud or want of power in the corporation. The stockholders gave authorization for and ratified the directors' interest here. Present interest of directors does not render a transaction void, but merely makes it voidable at the option of the stockholders of the company as distinguished from a single stockholder. Dana v. Morgan, 232 F. 85 (C. C. A. 2); Pollitz v. Wabash R. R. Co., 207 N. Y. 113, 100 N. E. 721; Russell v. Patterson, 232 Pa. 113, 81 A. 136, 36 L. R. A. (N. S.) 199.

When, on June 25, 1930, the board voted on the resolution to submit the plan to the company's stockholders, the directors had no self-interest, and the record discloses that they did not own or even control a majority of the stock on that date or at the time of the stockholders' meeting on July 28, 1930, at which time the plan was authorized. The New Jersey act required an approval by two-thirds of all classes of stock before the plan could be effective. The plan contemplated that the stock should be allotted, in part, for services that should be thereafter rendered. The stockholders were fully informed and advised that directors might obtain benefits under the plan. The notice to stockholders stated that "no employee or person * * * shall be deemed ineligible to the benefits of the Plan by reason of his being also a director of the Corporation." The later overwhelming approval of the directors' management by their re-election after the allotment was made to the employees, justified the claim that the stockholders had reiterated their former approval of the plan. As to (b), upon issuance of the stock and delivery to the trustees under the agreement, the Guaranty Trust Company paid $25 a share for each share of stock so delivered to it. Thus the American Tobacco Company received par value for the stock. The company during the entire year received services which were rendered in part upon the agreement that this stock had to be delivered to the employees to whom it was allotted under the plan. The statute authorizes stock to be issued without being paid for in full. The language is, "the issue * * * and the payment for such stock in installments or at any one time with or without the right to vote thereon pending payment therefor in full." See Morgan v. Bon Bon Co., 222 N. Y. 22, 118 N. E. 205; Vineland Grape Juice Co. v. Chandler, 80 N. J. Eq. 437, 85 A. 213, Ann. Cas. 1914A, 679.

The charter of the corporation permitted compensation to employees and officers in the form of a stock interest. It provides that the company shall have the powers conferred by section 1 of the act concerning corporations (Laws of 1896, c. 185, p. 278 [2 Comp. St. N. J. 1910, p. 1598, § 1, par. 5]). Section 1 of that act provides: "Every corporation shall have power: * * * V. To appoint such officers and agents as the business of the corporation shall require, and to allow them suitable compensation." The form of compensation, whether in stock or a share of the profits, is within the implied powers of the corporation. Bennett v. Millville Improvement Co., 67 N. J. Law, 320, 51 A. 706; Booth v. Beattie, 95 N. J. Eq. 776, 118 A. 257, 123 A. 925; Harker v. Ralston Purina Co., 45 F. (2d) 929, 930 (C. C. A. 7); Church v. Harnit, 35 F. (2d) 499 (C. C. A. 6).

In the Harker Case, the Seventh Circuit said: "Every corporation has the right incidental to its expressed powers and purposes to exercise such incidental power as is necessarily implied in the legitimate achievement of its expressed powers. Among such is the employment of efficient employees. At the time appellee made the contract before us, it contracted for appellant's services for five years, and obligated itself, in consideration therefor, to sell to him some of its capital stock at a price less than its market value. By selling the stock to the employee, appellee made sure that the employee would have a personal interest in the welfare of the corporation. The natural tendency of such interest was to increase the zeal of the employee and thus to forward the chances of success in the corporation's legitimate operations. Furthermore, it enabled the faithful employee, if he continued his employment to

the maturity of his contract, to partake of the profits of the corporation. In a word, the contract contemplated the insurance of faithful efficient service to the corporation and a corresponding reward to the employee. Such a contract was clearly praiseworthy in its motives from the viewpoint of both parties, and the option to repurchase was clearly included to encourage the stay of the employee to the end of the period of his employment. In view of the fact that the performance of the option would work none of the results condemned by the courts of Missouri, viz., damage to creditors, impairment of capital, or jeopardy to the financial interests of any interested party, it follows that the contract was clearly within the implied powers of the corporation."

██ The fact that the stock may have been selling at a higher price in the open market does not brand the employees' subscription plan as fraudulent. The stock was issued for par and in recognition of efficient services which had been rendered and the promise of like services in the future. It was not necessary to the validity of the plan that the stock allotted under it be offered first to the appellee or any other stockholder of the company. The statutory right to such offer applies only to an issue for cash at the time the stock is sold, whereas stock allotted under this employees' plan passed first to the trustee, was paid for in cash, and lawfully issued pursuant to chapter 175 of the Laws of 1920 (Comp. St. Supp. § 47—183 et seq.).

██ The allotment of the stock under the plan was authorized by 99.99 per cent. of the stock represented in person or by proxy at the stockholders' meeting. This overwhelming vote leaves little to be desired in the approval of the management of the internal affairs of this corporation by its stockholders. It is only where actual fraud, and not alleged constructive fraud, is established, that the courts should interfere. The corporation had the right to aid and encourage its employees; the board of directors and stockholders deemed it good business policy. The selling price of the stock on the market (which is always subject to fluctuation) will not justify an allegation of insufficient consideration amounting to fraud. The corporation received what those in charge of its internal affairs deemed to be sufficient as its par value. The directors had the right to select employees who, in their judgment, were entitled to benefits under the plan and to apportion to them their respective rights to subscrip-

tion. This was a matter of internal management of the corporation's affairs.

██ Moreover, there is no allegation in the complaint setting forth a demand upon the stockholders to take action, nor are there reasons stated to excuse such failure prior to the institution of these suits. Equity Rule 27 (28 USCA § 723) provides: "Every bill brought by one or more stockholders in a corporation against the corporation and other parties, founded on rights which may properly be asserted by the corporation, * * * must also set forth with particularity the efforts of the plaintiff to secure such action as he desires on the part of the managing directors or trustees, and, if necessary, of the shareholders, and the causes of his failure to obtain such action, or the reasons for not making such effort."

The complaint does allege a demand upon the directors in the form of a letter, and the refusal of the directors to take any action thereon within the twenty-day period fixed by the plaintiff. But there were remedies, within the company, which were open to the plaintiff as a stockholder under the laws of New Jersey.

(a) Section 3, c. 175, p. 357 of the Laws of 1920 (Comp. St. Supp. N. J. § 47—185) provides that "any plan adopted * * * may be recalled, abolished, revised, amended, altered or changed in the same manner as is herein provided for its adoption. * * *" (b) If the stockholders desire any change with respect to the corporate affairs, any three such stockholders may call a meeting for that purpose without even calling upon the directors to take such action. Laws of 1896, c. 185, p. 292, § 46 (2 Comp. St. N. J. 1910, p. 1629, § 46). See Watts v. Vanderbilt, 45 F.(2d) 968 (C. C. A. 2); Stone v. Holly Hill Fruit Products, 56 F.(2d) 553, 554 (C. C. A. 5).

The appellee could have asserted these rights. The lapse of time since the plan was approved and the stock allotted thereunder and the services performed by the allottees was ample. In the Stone Case, the court said: "The minority have a right to have the majority exercise their judgment, and to exercise it honestly and not fraudulently, but have no right to have a court substitute their own ideas and wishes for those of the majority, and that in advance of any refusal of the majority to hear and decide on the matter at issue. Minority stockholders may not in the absence of sudden emergency ask a court of equity to interfere in the management of

their corporation until they have earnestly and unsuccessfully sought redress from the Board of Directors, and where appropriate also from the stockholders in meeting, unless they can show sufficient reasons for not doing so. This is implied in the provisions of Equity Rule 27 (28 USCA § 723). For defect in this respect a bill will be dismissed. Wathen v. Jackson Oil & Ref. Co., 235 U. S. 635, 35 S. Ct. 225, 59 L. Ed. 395; Corbus v. Gold Mining Co., 187 U. S. 463, 23 S. Ct. 157, 47 L. Ed. 256; Hawes v. Oakland, 104 U. S. 450, 26 L. Ed. 827; Dimpfel v. Ohio & Miss. R. R. Co., 110 U. S. 209, 3 S. Ct. 573, 28 L. Ed. 121; Memphis v. Dean, 8 Wall. at page 73, 19 L. Ed. 326.

The general averment that complainants had objected to the president does not meet the particular requirements of the rule. There is alleged no dominance of the board of directors or of the stockholders by those whose personal interests are adverse to the relief sought by the bill such as to make it evidently futile to expect fair consideration within the corporation. * * *"

Unless the directors were majority stockholders, it was the duty of the appellant to go to the directors or show adequate reason why action in that respect would be futile. Here the directors were not majority stockholders or, indeed, in control of the company.

■■■■ Courts seldom interfere in the control of the internal affairs of a corporation, except where the directors are guilty of misconduct equivalent to a breach of trust, or where they stand in a dual relationship which prevents an unprejudiced exercise of judgment, and then, as a rule, only after an application to the stockholders or a showing that there was no opportunity for such application. United Copper Co. v. Amalgamated Copper Co., 244 U. S. 261, 37 S. Ct. 509, 61 L. Ed. 1119.

For these reasons the bill of complaint was properly dismissed.

Decrees affirmed.

SWAN, Circuit Judge (dissenting).

On the ground that the suits involved the internal affairs of a foreign corporation, the court below declined to assume jurisdiction and dismissed the complaints "without prejudice to the enforcement of the rights of the plaintiff, if any, in the courts of New Jersey." The decision of this court has affirmed that decree, but has also, if I correctly understand it, undertaken to construe the New Jersey statute and to decide upon the merits that the stock in controversy was validly issued. From this conclusion I dissent.

The New Jersey statute (chapter 175, p. 354, Laws 1920 [Comp. St. Supp. N. J. § 47—183 et seq.]), pursuant to which the stock distribution in question purports to have been made, reads in part as follows:

"1. Any stock corporation formed under any law of this State may, upon such terms and conditions as may be determined in the manner hereinafter designated, provide and carry out a plan or plans for any or all of the following purposes:

"(a) The issue or the purchase and sale of its capital stock to any or all of its employees and those actively engaged in the conduct of its business or to trustees on their behalf, and the payment for such stock in installments or at one time with or without the right to vote thereon pending payment therefor in full, and for aiding any such employees and said other persons in paying for such stock by contributions, compensation for services, or otherwise." Comp. St. Supp. N. J. § 47—183(a).

"2. Any of the privileges and powers hereinbefore granted may be exercised in the manner following:

"(a) By including appropriate clauses therefor in the original articles of incorporation or by-laws at the time of organizing the corporation.

"(b) Where the corporation has been formed without the said charter or by-law provisions the board of directors shall first formulate such plan or plans and pass a resolution declaring that in its opinion the adoption thereof is advisable, and shall call a meeting of the stockholders to take action thereon. The stockholders' meeting shall be held upon such notice as the by-laws provide, and in the absence of such provision upon ten days' notice given personally or by mail. If two-thirds in interest of each class of stockholders present at said meeting and voting shall vote in favor of any such plan or any modification thereof, the said plan shall thereupon become operative." Comp. St. Supp. N. J. § 47—184(a, b).

The statute also provides that a dissenting stockholder may have his stock appraised, "without regard to any depreciation or appreciation thereof in consequence of the adoption of such plan," and receive payment from the corporation, or be permitted to sub-

scribe for his proportionate share of the new stock issued under section 1.

It will be observed that the statute requires that the board of directors shall "first formulate such plan," declare it "advisable," and call a meeting of the stockholders to take action thereon. On June 25, 1930, the directors approved what was called an "Employees' Stock Subscription Plan." It provided as follows:

"The Board of Directors may, at such time or times as it may determine, by way of additional compensation for services to be rendered, offer and allot such stock for subscription, to employees of the Corporation, and/or its subsidiaries, and to those actively engaged in the conduct of its or their business, in such amounts and proportions, to such persons, at such prices not less than the par value of the shares allotted, payable in full or in such installments, and upon such other terms and conditions, all as shall be determined with respect to each offering of stock to each individual pursuant to authority to be granted by the Board of Directors to the President for such purpose."

On July 28, 1930, a meeting of stockholders was held and the so-called plan was approved by more than the required two-thirds vote.

It is apparent that the so-called plan submitted by the directors was in substance no more than a proposal that stock be issued to such employees, at such times, and on such terms (but at a price not less than par) as the directors and president might thereafter determine. This was not, in my opinion, "a formulated plan" such as the statute contemplated. It was a proposal that the stockholders abrogate the discretion which the statute vested in them to approve or disapprove a formulated plan declared by the directors to be advisable, and confer upon the directors and president complete discretion to determine and execute in the future, without further reference to the stockholders, any sort of allotment then thought desirable, provided only that the price to employees who were selected to share in it be not less than the par of the stock. The purpose of the statute was to let the stockholders know with some definiteness—"a formulated plan"—what the directors thought advisable, and to allow the stockholders to approve it, if at least two-thirds of them also deemed it advisable. This purpose is completely frustrated if it be sufficient to submit a plan which merely proposes that the directors shall be empowered to allot stock to employees on such terms as they may thereafter please. And the undesirability of transferring to the directors complete discretion as to what plan shall be formulated in the future is particularly apparent where, as here, they are entitled to benefit under the plan. It is aptly illustrated by what in fact happened. When the directors did formulate a definite plan, in January, 1931, it resulted in an allotment to themselves of nearly 33,000 shares of the total 56,712 shares to be issued to employees, and at a price of $25 per share when the market price was $112 per share. The president, who was also a director, received 13,440 shares. The size of his allotment was determined as follows: His fixed salary was $168,000 a year. He received a bonus of 2½ per cent. of the annual net profits. For the year 1930 these two amounts gave him $1,008,000. This was assumed to represent the comparative value of his services to the company. His allotment was then fixed so that the shares distributed to him would have a total par value equal to one-third of this sum. Allotments to the other director-employees were determined in a similar manner. Whether the board would have had the temerity to submit to the stockholders in advance a plan which on its face so largely benefited themselves, and whether the stockholders, however blindly they are accustomed to follow their leaders, would have approved such a plan had it been submitted in advance, can only be matter of speculation. It is true that the directors were re-elected after publicity had been given to the allotments, but that is a very different thing from approving such a plan in advance, when the issue could have been considered on its merits and unincumbered by any question of ousting a successful management. This is what the statute demanded. Since its provisions were not complied with, the corporation acquired no power to issue stock to employees in derogation of the pre-emptive rights of shareholders. The statute provided a method of adopting what in effect was an amendment to the corporate charter. Unless the prescribed method was followed, no legal amendment was effected. Consequently I believe the purported issuance by the directors of the stock in controversy was ultra vires and void.

The bills of complaint seek to have canceled this ultra vires issue of shares. They state a cause of action which the plaintiff may enforce without first appealing to the stockholders because the stockholders have

no power to ratify an issuance of stock contrary to the corporate charter; and, until the charter was legally amended, that is, until the directors had procured prior approval by the stockholders of a formulated plan, there was no power to issue the stock in question. Assuming, as have my brothers, that the court should consider the merits of the controversy, I think the bills were improperly dismissed.

Whether the court below abused its discretion in declining to exercise an admitted jurisdiction based on diversity of citizenship is a matter not free from doubt. Ample authority may be found for either view. Citations in favor of the District Court's position are given in its opinion; among cases pointing to an opposite conclusion the following may be cited: See American Creosote Works, Inc., v. Powell, 298 F. 417 (C. C. A. 5); Williamson v. Missouri-Kansas Pipe Line Co., 56 F.(2d) 503 (C. C. A. 7); Kraft v. Griffon Co., 82 App. Div. 29, 81 N. Y. S. 438; Cuppy v. Ward, 187 App. Div. 625, 176 N. Y. S. 233, 239, affirmed 227 N. Y. 603, 125 N. E. 915; Edwards v. Schillinger, 245 Ill. 231, 241, 91 N. E. 1048, 33 L. R. A. (N. S.) 895, 137 Am. St. Rep. 308; Busch v. Mary A. Riddle Co., 92 N. J. Eq. 265, 114 A. 348. Cf. also, Loan Society of Phila. v. Eavenson, 241 Pa. 65, 88 A. 295; Sprague v. Universal Voting Machine Co., 134 Ill. App. 379, 383; Babcock v. Farwell, 245 Ill. 14, 33, et seq., 91 N. E. 683, 137 Am. St. Rep. 284, 19 Ann. Cas. 74; and see 44 Harv. L. Rev. 437, 439. Admittedly it is a matter solely of convenience and expediency. Lack of power to render an effective decree is the reason most frequently assigned for refusal to take jurisdiction. No such obstacle is present in the case at bar. The plaintiff and a majority of the defendants, including the putative holder of the stock sought to be canceled, are citizens of New York. It is not likely that the domiciliary courts would fare so well in obtaining jurisdiction over the necessary parties. See Berendt v. Bethlehem Steel Corp., 108 N. J. Eq. 148, 154 A. 321, 322. The consideration which seemed most persuasive to the court below was that the determination of the merits would require it to construe the applicable New Jersey statute without an authoritative guide from the courts of that state. But this is a duty which courts are frequently called upon to perform. Where the question presented is no more complicated than in the case at bar, this affords no ground in itself for refusal to exercise jurisdiction.

For the reasons stated, I am of the opinion that the decree should be reversed.