MARGARET ANN BABCOCK, Appellant, *vs.* JOHN V. FAR-
WELL, JR., *et al.* Appellees.

*Opinion filed April 21, 1910.*

1. CORPORATIONS—*jurisdiction of courts in controversies con-
cerning internal affairs of foreign corporations.* Except in cases
involving the exercise of visitorial powers, the doctrine that courts
decline jurisdiction of controversies relating to the management
of the internal affairs of a foreign corporation is not strictly a
question of jurisdiction but rather of discretion in the exercise
of jurisdiction, and the rule rests more on grounds of public pol-
icy and expediency than on jurisdictional grounds, and more on
want of power to enforce a decree than on jurisdiction to make it.

2. SAME—*when courts will decline jurisdiction.* Courts will
decline to take jurisdiction of a controversy relating to the affairs
of a foreign corporation where the wrongs complained of are
merely against the sovereignty by which the corporation was cre-
ated or the law of its existence, or are such as to require for
their redress the exercise of visitorial powers of the sovereign, or
where full jurisdiction of the corporation and of its stockholders
is necessary to such redress and is wanting.

3. SAME—*when court should take jurisdiction of suit concern-
ing foreign corporation.* Where the relief sought by a bill by a
stockholder in a foreign corporation substantially amounts to re-
quiring resident directors to restore to the corporation such sums
of money as upon an accounting they shall be found to have un-
lawfully diverted and retained from it, and the corporation and
all persons necessary to a decree adjusting the rights in the con-
troversy have appeared in the cause, the court should exercise the
power of determining the controversy without remanding the suitor
to a foreign jurisdiction.

4. SAME—*stockholder may require directors to account to cor-
poration wherever they are found.* A corporation may maintain
a suit for accounting against defaulting directors or officers wher-
ever they may be found, and a stockholder who seeks to enforce
the same right in favor of the corporation may maintain a similar
suit, even though the act complained of is, in part, that of the
corporation itself and though the complainant is affected only in
his capacity as a stockholder, as the suit is, in effect, for the bene-
fit of the corporation itself.

5. SAME—*when stockholder cannot maintain suit in behalf of
corporation.* The theory of a suit by a stockholder to compel res-
toration to the corporation of funds unlawfully diverted and re-

tained by its officers and directors is, that he has, himself, sustained a wrong through the injurious effect upon his stock, and if he has himself consented to or participated in the acts constituting the wrong or has waived his right to object to them, he cannot afterwards maintain a bill for relief for the benefit of the corporation or other stockholders.

6. SAME—*the assignee of stock has no greater rights than assignor.* The assignee of shares of stock in a corporation acquires no greater rights than his assignor, as he holds by the same title and subject to the same liability, and he cannot maintain a suit in regard to transactions with the corporation done or assented to by his assignor.

7. SAME—*effect where a stockholder ratifies acts of directors.* If a stockholder, in settling matters in dispute between himself and the directors of the corporation, for valuable consideration expressly ratifies all transactions between them and the corporation and waives all right he might have to object to such transactions, he cannot, while the contract remains unrescinded, seek relief against such transactions by suing in his own right or in behalf of the corporation or other stockholders; nor can such suit be maintained by his executor or the legatee of the stock.

8. SAME—*when demand is necessary before a stockholder can bring suit.* A demand upon the directors to bring suit is, in general, essential before a stockholder can maintain a suit to enforce a right of the corporation, and it is only when the majority of the directors are themselves involved in the matters complained of, so that it is evident a demand would be unavailing, that it can be dispensed with.

9. CONTRACTS—*right to rescind contract must be exercised in toto.* If a party accepts the provisions of a contract which are of advantage to him he is bound by the provisions which purport to be obligatory upon him, and if the right to rescind exists it must be exercised *in toto,* as the contract must stand in all its provisions or fall altogether.

10. SAME—*party cannot retain consideration and refuse to be bound.* A party to a contract cannot retain the consideration, or a part of it, and refuse to be bound; and the fact that he is unable to restore the consideration does not relieve him from the necessity of doing so, nor is it sufficient to offer to set off the amount against what is claimed from the other party.

11. SAME—*rule where release was obtained by fraud not going to its execution.* The rule that it is not necessary to return the consideration in order to avoid a release obtained by fraud refers to fraud in the execution of the instrument and not to fraud go-

ing to the consideration, and in the latter case the release is not void but voidable, and is binding upon the party executing it until it is set aside in a court of equity.

12. SAME—*contract creating power coupled with interest is not terminated by death of one party.* A contract between a corporation and a syndicate, whereby the latter is entitled to the exclusive possession and use of certain real estate and personal property for a term of years as security for and in compromise of the syndicate's claims against the corporation, creates a power coupled with an interest, and the contract is not terminated by the death of a member of the syndicate.

13. SAME—*survival of rights and duties where one joint contractor dies.* Whether a contract is such as to require the personal services of all of the joint contractors, so as to be terminated by the death of one or more, does not depend upon whether the rights and obligations devolve upon an administrator but whether they survive to and against the surviving joint contractors, and, in general, upon the death of one joint contractor before complete performance the survivors are bound by the contract and entitled to its benefit.

FARMER, C. J., and VICKERS and COOKE, JJ., dissenting.

APPEAL from the Appellate Court for the First District;—heard in that court on appeal from the Superior Court of Cook county; the Hon. GEORGE A. DUPUY, Judge, presiding.

KRAUS, ALSCHULER & HOLDEN, for appellant:

The courts of this State have jurisdiction over a bill brought by a minority stockholder to compel directors to account for funds fraudulently diverted by them from their corporation, although it is a foreign corporation. Beale on Foreign Corp. secs. 309, 312; *Harding* v. *Glucose Co.* 182 Ill. 551; *Sloan* v. *Clarkson,* 105 Md. 171.

Wherever the corporation itself may invoke the jurisdiction of the courts of this State, a stockholder may, in behalf of the corporation, maintain an action in our courts. *Sloan* v. *Clarkson,* 105 Md. 171; *Ernst* v. *Rutherford,* 38 App. Div. (N. Y.) 388; *Wineburgh* v. *Advertising Co.* 173 Mass. 60; *Richardson* v. *Wall Trunk Manf. Co.* 181

id. 580; *Wilson* v. *Car Co.* 64 N. J. Eq. 534; *Dunbar* v. *Telephone Co.* 224 Ill. 9; *Miller* v. *Quincy,* 179 N. Y. 294; *Cummings* v. *Yates Co.* 107 N. Y. Supp. 498; *Watkins* v. *Trust Co.* 107 La. 107; *Guilford* v. *Telegraph Co.* 59 Minn. 332; 3 Clark & Marshall on Corp. sec. 865; 4 id. sec. 865.

That the corporation is one organized in England, and that it may be necessary to determine and apply the law of that country, is no ground for refusing to entertain jurisdiction. *Mandel* v. *Land Co.* 154 Ill. 177; *Watkins* v. *Trust Co.* 107 La. 107; *Railway Co.* v. *Gebhard,* 109 U. S. 527; *Republic S. M. Co.* v. *Brown,* 7 C. C. A. 412.

·The subject matter, the funds diverted by and in the hands of the director appellees, and the persons, are all within the jurisdiction of this State. The subject matter being one upon which the Capitol company itself could bring suit in this State against the other appellees, there is local jurisdiction, even though property in Texas may be involved in the result. *Phelps* v. *McDonald,* 99 U. S. 298; *Investment Co.* v. *Gardiner,* 62 Fed. Rep. 954; *Sercomb* v. *Catlin,* 128 Ill. 556; *Cole* v. *Cunningham,* 138 U. S. 107.

Appellant has made such a showing of control of the corporation by the defendants, and of refusal of the officers and management to take action, as warrants action by her in behalf of the corporation. *Groel* v. *United El. Co.* 68 N. J. Eq. 249; *Green* v. *Hedenberg,* 159 Ill. 489; *Higgins* v. *Lansingh,* 154 id. 345; *Klein* v. *Brewing Ass.* 231 id. 594; *Sloan* v. *Clarkson,* 105 Md. 171.

HORACE KENT TENNEY, M. LESTER COFFEEN, and ROGER SHERMAN, for appellees:

The Capitol company is a foreign corporation, and the courts of Illinois cannot exercise jurisdiction over its internal affairs, or pass upon claims arising between its stockholders or between it and its stockholders relative to the conduct of its affairs. In such cases the courts of this State will not take jurisdiction, and it makes no difference

that service can be obtained on the corporation or that it appears. *Young* v. *Farwell,* 139 Ill. 326; *Kansas Co.* v. *Topeka Co.* 135 Mass. 34; *Kimball* v. *Railway Co.* 157 id. 7; *Watson* v. *Buzzell,* 181 id. 338; *Bank* v. *New England E. Works,* 2 L. R. A. (N. S.) 551; 3 Clark & Marshall on Corp. sec. 864; 7 Thompson on Corp. sec. 8011; *Horse Shoe Nail Co.* v. *Steel Co.* 142 Mass. 349; *Smith* v. *Life Ins. Co.* 14 Allen, 336; *Condon* v. *Mutual Reserve,* 89 Md. 99; *Wilkins* v. *Thorn,* 60 id. 253; *Mining Co.* v. *Field,* 64 id. 151; *Gregory* v. *Railway Co.* 40 N. J. Eq. 38.

JAMES E. MUNROE, for appellee the Capitol Freehold Land and Investment Company.

Mr. JUSTICE DUNN delivered the opinion of the court:

This. was a stockholder's suit begun in the superior court of Cook county by the appellant, as the owner of 15,196 shares of the stock of the Capitol Freehold Land and Investment Company, Limited, a corporation organized under the laws of Great Britain and Ireland, for and on behalf of all other stockholders in that corporation as well as on her own behalf, against the corporation, John V. Farwell and the executors of the will of Charles B. Farwell, deceased, whereby it is sought to have various contracts between the corporation and John V. Farwell and Charles B. Farwell declared unconscionable and void, to charge John V. Farwell and Charles B. Farwell as trustees for the corporation and compel them to account for, pay over and deliver to the corporation all property. received, held or claimed by them under any of the contracts sought to be set aside and all profits made thereon, and to compel an accounting of various other transactions arising out of the relations and contracts between the corporation and the Farwells whereby it is alleged that the assets of the corporation have been fraudulently reduced. The Appellate Court affirmed the decree of the superior court

sustaining a demurrer to the amended bill and dismissing it for want of equity.

The transactions set out in the bill extend over a period of many years and are numerous and complicated. In 1882 Matthias Schnell entered into a contract with the State of Texas for the erection of a State capitol building in consideration of a land grant of 3,000,000 acres. This contract was assigned to John V. Farwell, Charles B. Farwell, Abner Taylor and Amos C. Babcock, the husband of appellant, who later assigned it to Taylor alone but without any change of interest, their equal interest in and obligation upon the contract being evidenced by a written agreement signed by all of them, dated December 4, 1882. Babcock was unable to advance any money toward the carrying out of the contract, and on November 12, 1884, being indebted to Charles B. Farwell, he assigned his one-fourth interest in the contract to Farwell as security for his indebtedness. On September 19, 1885, Babcock, in consideration of the release of his indebtedness to the Farwells and of the additional sum of $25,000 paid him, the total consideration not exceeding $40,000, transferred one-half of his interest in the contract to them absolutely, and they executed an acknowledgment that they held an eighth interest in the contract in trust for him and agreed to account to him for one-eighth of the net profits, including the cattle business proposed to be carried on upon the lands received from the State, it being understood that Babcock should not be required to furnish any money.

Previous to this sale of one-half of Babcock's interest the Capitol Freehold Land and Investment Company had been incorporated in the summer of 1885, and in anticipation of such incorporation a contract had been entered into on June 1, 1885, between Taylor, the Farwells and William Chase Prescott as manager for and trustee on behalf of the company, wherein it was represented by Taylor and the Farwells that they were the only persons having any

interest in the contract for the erection of the State capitol and the profits thereof or the lands to be acquired thereunder, and in particular that Babcock had no longer any interest therein. It was then agreed that Taylor should sell to the company the entire tract of land, containing not less than 3,000,000 acres, appropriated for the purpose of erecting the new capitol, in exchange for 199,993 shares, of the par value of £10 each, of the company's stock, and £600,000 in cash or first mortgage debentures of the company, being part of a proposed issue of £1,000,000, all having an equal lien and bearing five per cent interest; that when the remaining £400,000 had been subscribed or issued for the purpose of stocking the property, or as soon as the property was sufficiently stocked and the requisite improvements completed, even though the full £400,000 might not have been issued, the directors should take steps for the issue of the £600,000 and pay the proceeds to Taylor and the Farwells; that Taylor and the Farwells might at any time demand and receive any portion of the £600,000 of debentures then unissued, and that they would apply for and have allotted to them 149,993 shares of the stock, leaving 50,000 shares, which were to be used as a bonus in selling debentures of the company, subject to conditions mentioned in the contract. The Farwells agreed to transfer to the company all live stock on hand, and the company agreed to apply the proceeds of debentures not intended for payment to vendors of land to the improvement and stocking of the property. The net profits of the company were to be applied to the payment of the interest on debentures issued, and until such net profits were sufficient for that purpose Taylor and the Farwells agreed to make good the deficiency. John V. Farwell was to be the first managing director in the United States, with the general management of the lands and property of the company and the conduct of its business in America, subject to the approval and control of the directors. The board of direct-

ors, and such agents in the United States as they might appoint, should alone act for the company, and not the American directors or managing director. Any differences or disputes arising between the parties touching the agreement or its construction, or any clause or thing therein or matter relating thereto, should be left to and be absolutely decided in England by arbitration, and for the purpose of such arbitration the agreement might be made a rule of her majesty's High Court of Justice in England. Babcock, though he then owned a fourth interest in the capitol contract, had no knowledge of the contents of this agreement until after the sale of half of his interest to the Farwells, on September 19, 1885. The incorporation of the Capitol Freehold Land and Investment Company was in accordance with this agreement. Its purposes were very broad, and included the acquisition, development and improvement of the Texas land, the stocking of it and raising and dealing in all kinds of live stock. Both the Farwells were directors, and John V. Farwell was made first managing director in the United States.

The bill alleges that the Farwells received for the contract of June 1, 1885, and the sale thereby of said 3,000,-000 acres of land, £1,999,930 of the capital stock of the company and £600,000 of debentures, altogether amounting to $12,884,000; that the total cost of the erection of the capitol building did not exceed $3,200,000, of which not over $500,000 had then been paid; that one-eighth interest in the capitol building contract belonged to Babcock and was worth $1,456,500; that after deducting certain proper charges against this interest there remained a net profit thereon of $742,333, yet the Farwells bought it for themselves, of Babcock, for $40,000; that they occupied a fiduciary relation to the company and had no right to purchase said interest without giving the company the benefit thereof; that they did not for many years afterward disclose to the company, or its officers, directors or stockhold-

ers, the fact of making said contract with Babcock and should be held to have purchased and to hold said interest for the company.

By the agreement of June 1, 1885, Taylor and the Farwells agreed to advance to the company such amount of money as might be necessary to pay any deficiency of interest on the debentures not covered by the net cash profits of the company, to be re-paid to them only out of net cash profits. It is alleged that there were no net profits before January 1, 1889, but an actual loss, and that the Farwells made false statements to the company as to the net profits, and the debenture interest was actually paid out of the capital of the company. Various modifications of the agreement of June 1, 1885, were made at different times, and on February 1, 1888, a supplementary agreement was made in regard to the payment of debenture interest, whereby Taylor and the Farwells were to pay such interest only in case of a deficiency for that purpose in the gross receipts of the company from the sale of cattle instead of in the net cash profits. It is averred that Babcock never knew of this agreement, nor did the complainant, until 1906.

On February 15, 1888, an agreement was executed by Taylor, the Farwells, Babcock, John T. Chumasero and the firm of John V. Farwell & Co., wherein, after reciting, among other things, that the signers had formed a syndicate for the erection of a State house at Austin, Texas, and that the money expected from the sale of debentures had not been received, and John V. Farwell & Co. had advanced, and were still advancing, large sums, it was agreed that in consideration of the advances so made and to be made until the sum requisite for the completion of the State house was raised, the syndicate should give to John V. Farwell & Co. twenty-five per cent of the total issue of stock of the Capitol Freehold Land and Investment Company as a bonus for such advances, all expenses incident to placing the total amount of the debentures to be a charge

upon the stock so given as a bonus and the debentures to
be carried or bought by John V. Farwell & Co. without
expense to the syndicate. On January 5, 1889, the State
house having been completed, the members of the syndi-
cate executed another agreement concerning the issue of
the stock. It recited that they were entitled to the dispo-
sal of about 180,000 shares, and it was agreed that these
shares should be allotted as follows: 30,000 to Taylor,
15,000 to Babcock, 7500 to John T. Chumasero, 33,750 to
each of the Farwells and the residue to John V. Farwell
& Co. The disposition of several unsettled matters was
agreed upon, and, except as specifically stated, John V. Far-
well & Co. agreed to pay all debts of the syndicate incurred
in the erection of the State house and all expenses incurred
or to be incurred in the sale of debentures. They were
also to have all the remaining unsold debentures belonging
to the syndicate and all lands belonging to the syndicate
and not deeded to the Capitol Freehold Land and Invest-
ment Company. The only unsettled matters which were
not assumed by John V. Farwell & Co. were a litigation
with E. E. Myers and S. B. Burke, which the bill avers
was settled at an expense not exceeding $3000, and the
cost of 15,000 head of cattle, which, it is also averred, was
paid by the sale of the cattle. Babcock, when this agree-
ment was signed, knew nothing of the modification of the
agreement of June 1, 1885, or the execution of any of the
agreements to which he was not a party, and the Farwells
represented to him that the obligation of the vendors re-
mained the same as under the agreement of June 1, 1885.

In April, 1889, Babcock authorized John V. Farwell to
receive the 15,000 shares of stock due to Babcock, and Far-
well wrongfully procured the shares to be issued to him-
self or to Charles B. Farwell and then refused to deliver
the stock to Babcock, claiming to have advanced large sums
of money which were a charge against said stock. After
much fruitless negotiation Babcock filed a bill in the cir-

cuit court of Cook county on June 15, 1891, to obtain possession of said stock and an accounting from the Farwells. The latter filed a cross-bill seeking to charge the stock with liens, and on January 30, 1896, the matters in controversy were settled and the suit dismissed. Among other things, the parties mutually released each other from all claims or demands. The Farwells paid Babcock $15,000, and delivered 10,000 shares of ordinary stock and 10,000 shares of deferred stock, at Babcock's request, to William H. Parlin. Certain of these shares were delivered to Babcock's creditors, at his request, in payment of his debts, and the rest remained in Parlin's possession until Babcock's death, on February 25, 1899. Babcock died testate, and the shares of stock, in accordance with his will, were transferred to the appellant and constitute the basis of this suit. In the meantime, on March 27, 1889, the company leased the Texas lands to the Farwells and Taylor for the term of five years from January 1, 1889, at an annual rental of fifteen cents per acre and five per cent of the value of the cattle on the land. The lessees were to manage the cattle on the land, develop and improve the land, provide water, pay taxes and keep up repairs. They might sell certain kinds of the cattle and use the proceeds for the payment of rent and other money required to be paid out by the lessees under the lease, except such sums as should be necessary to pay the interest on the debentures, London expenses and fixed charges of the company. They agreed to deliver to the company, at the expiration of the lease, not less than 150,000 head of cattle of the same ages and classes as the present herd.

The bill avers that the lands were operated under said lease at a loss, but that on July 29, 1892, the directors presented a report to the stockholders showing a profit, and a dividend of two and a half per cent on ordinary shares was declared and paid. On that day a new agreement was entered into terminating the lease on December 31, 1892;

reciting the fact that a large number of debentures were outstanding, some of which would become due in 1892 and others at different times thereafter; that the business upon the company's ranches conducted by the lessees showed an increasing profit, more than sufficient to pay interest on debentures; that the lessees had made advances of money and were willing to continue the business and guarantee sufficient profits to pay all expenses of the company and interest on its debentures and waive all claims for advances, except the right to be reimbursed from surplus profits above said expenses and interest. The lessees sold to the company their cattle, horses and outfit on the ranches and agreed to guarantee the payment of interest on the re-issue of any debentures, and the company agreed that the lessees, as its agents, should conduct the business of raising cattle on the company's lands and of buying and selling cattle, and out of the profits reimburse themselves for interest paid on debentures, pay the expenses of the company, pay any dividends declared by the company, reimburse themselves for advancements made in the purchase of cattle and deliver the surplus profits to the treasurer of the company. The company assumed no obligation with respect to said advances, which were to be re-paid solely from the profits of the business over and above the prior disbursements to be made therefrom, and when all said advances should have been re-paid, the lessees agreed to turn over to the company the ranches, with cattle thereon to the number of at least 150,000.

The bill charges that the recitals contained in the said agreement were fictitious and insufficient to warrant its execution, and that the agreement was made in pursuance of a plan to obtain the profits of the business for the lessees; that in pursuance of such plan, on the 22d day of February, 1893, another agreement was entered into, reciting the maturing of a number of debentures of the company and the inability of the company to pay them; that

at a meeting of the debenture holders on January 10, 1893, a resolution was passed, which is attached to the agreement, and which provided for the extension of maturity of the debentures to December 31, 1907, subject to prior redemption at the option of the company, and that the rate of interest from January 1, 1893, should either be five per cent per annum, or, at the option of the holder, four per cent, the holder so electing to receive from the Farwells and Taylor twenty-five per cent of the face value of the debentures in fully paid up shares of the company at par, the interest on all debentures to be guaranteed by the Farwells and Taylor. By said agreement the Farwells and Taylor agreed to transfer to the debenture holders fully paid up shares of the capital stock of the company in accordance with the resolution, and further agreed to pay the interest on the debentures in case the company failed to pay it. The company covenanted not to declare or pay any dividends until all of the debentures had been redeemed or paid off. The bill alleges that there was no occasion for this agreement, as the income from the business on the ranches of the company was more than sufficient to pay all interest on said debentures; that the Farwells and Taylor were already bound as guarantors of the higher rate of interest on said debentures, and that the purpose of the agreement was to secure a reduction in the interest on said debentures, with the view that they might absorb all the income of the business of the company over the amount of the reduced interest, and also the application of the proceeds of cattle to the payment of debenture interest, whether such proceeds represented net profits or whether they impaired the capital of the company.

The bill alleges that the Farwells and Taylor became dissatisfied, and being aware that the consideration for the said agreement would not stand upon any just accounting, and without any valid reason therefor, caused the company, by its board of directors, of whom they formed a part and

whom they controlled, to enter into another agreement on July 12, 1894. This agreement is set out in full, its most material parts being as follows: After reciting the guaranty by the Farwells and Taylor (called the syndicate) of the payment of interest on all debentures from January 1, 1893, it is agreed that until all of the said debentures have become due, or until default in the payment of any of them, the syndicate shall manage the business of raising cattle on the ranches of the company; that they shall keep a minimum number of 120,000 head of cattle thereon, properly graded and the same as now thereon; shall sell and buy such cattle as shall be necessary to maintain the grade, and shall maintain and keep in repair the buildings, fences and equipment; that they shall, in addition to paying interest on debentures as provided by the contract of February, 1893, pay all expenses of carrying on the business, including the purchase money of cattle and other things bought, and shall render an annual account of all cattle bought and sold and of all expenses. They shall receive for their own benefit the proceeds of all the cattle sold by them, which shall be accepted in full satisfaction of all claim against the company for interest and money paid out under any clause of this contract, and the company shall have no claim against the syndicate for money received from the sale of cattle. When all the debentures are due, the syndicate will surrender its agency and hand over to the company the ranches, and all equipment, in good condition, and cattle to the number of 120,000 head, of the same grade as then on the ranch. If the cattle shall be less than 120,000 head or of a lower grade, the difference in value shall be paid to the company; if there shall be over this number of cattle, the excess shall belong to the syndicate. All amounts expended by the syndicate since December 31, 1892, for permanent improvements, shall be refunded to them. The syndicate waives all claims against the company and the company waives all claims against the

syndicate. It is recited that the agreement shall operate from January 1, 1893, and all other agreements in conflict therewith are superseded and abrogated. The account of the syndicate on the books of the company shall be closed on December 31, 1892, and shall show no balance on either side. It is agreed there were 128,259 head of cattle then on the ranches of the company.

Prior to the execution of the July 12, 1894, agreement, a draft of an agreement between the same parties had been prepared, bearing date February 6, 1894. The material parts of this draft were similar to those of the agreement of July 12, 1894, but it was not signed by the parties. Said draft recited that the syndicate claimed the company was indebted to it for £420,000 while the company claimed the syndicate owed it £38,000, and both claims were proposed to be settled by the agreement as drafted. The bill sets out, with much detail, that all of these agreements were procured to be entered into by the Farwells and Taylor for the purpose of enabling them to reap the benefits of all profits made, which were alleged to be very large. The bill seeks to avoid the effect of the settlement made by Babcock in 1896 by reason of the frauds alleged to have been practiced by the Farwells to procure it. It avers that at the time of her husband's death the appellant was of the age of sixty-six years and not familiar with business affairs, and that Babcock, at the time of making the settlement agreement, and for some time prior to his death, was in ill-health and incompetent to transact business affairs.

On June 9, 1901, the appellant caused to be served upon the Capitol Freehold Land and Investment Company a request that steps should be taken to annul the contract of July 12, 1894, and secure an accounting from the syndicate. No attention being paid to such request, she later filed a bill in the State of Texas for such relief. Answers were filed, and the case being called for trial, after evidence had been given, on the 8th day of April, 1902, it is alleged

that appellant, being of advanced age and without means to prosecute said cause, and being then wholly ignorant of any grounds for assailing the said settlement of 1896 save those stated in said bill filed in Texas, and being unable, because of the death of said A. C. Babcock, to prove such allegations, and being wholly ignorant of the false character of the representations and fraudulent transactions herein set forth and not mentioned in said bill in Texas, dismissed the Texas bill; that appellant was induced to dismiss her said Texas bill in large part by the assertions and statements set out in the answers of the Farwells made under oath; that in the Texas litigation she was opposed by the Capitol company, when, as she claims, she should have had its assistance; that in reply to requests and demands for assistance from said Capitol company, being wrongfully led and controlled by J. V. Farwell, it stated to appellant that there was no ground whatever for the various claims made in said statement and requests, and left your oratrix to take such course as your oratrix thinks fit. Appellant further alleges that she has not been able, owing to said misrepresentations of said defendants, even to the present time, to fully ascertain the character and details of all of the acts of said defendants, and that she has only been able to secure and frame the facts herein set forth within the last few months; that the appellant first applied to the counsel in this cause about June 1, 1905, and laid before them the record in the Texas suit and such papers as she had in relation thereto; that such counsel spent several months in examining such papers, and not until the fall of 1905 did they, from their investigation of such papers and from investigations made by her son, advise her, nor did she have reason to suspect, that the representations of the syndicate as to the company's earnings in the year 1899, and the representations of the Farwells to Babcock as to the indebtedness of the company, were untrue; that she did not ascertain the facts stated in the original bill earlier than six months

before its filing, and that since its filing she learned of the following matters: (1) The pretended contract of February 1, 1888, and the action of the directors thereon; (2) that no reference to the interest of Babcock appeared in the company's record for 1885; (3) that shortly after May 3, 1893, the directors sent an accountant to America to facilitate the preparation of the yearly accounts; (4) that the directors resolved to take the opinion of counsel relative to the liability of the syndicate under the agreements of 1892; (5) that by correspondence and cablegrams J. V. Farwell first suggested and dictated the execution of the July 12, 1894, contract; (6) that on October 16, 1893, the company's accountants made a report in writing, shown in the depositions, that the company was not indebted to the syndicate, and that there were only 128,259 head of cattle on hand December 21, 1892, and a balance then due by the lessees of £38,693, 19s. 5d., with a statement that the actual sum expended in excess of receipts by the lessees appears to be £424,024, 3s.

It is further alleged the Farwells have been residents of Illinois continuously since 1885, and that John V. Farwell and the representatives of Charles B. Farwell were such residents at the time the bill was filed; that the Capitol company had its main land office in Chicago, and that practically all its business was carried on in Chicago under the supervision and direction of John V. Farwell; that all the money of which the company has been deprived is represented by the liability of the defendants resident in Chicago; that the Farwells, appellant and other residents of Illinois own about nine-tenths of all the company's stock; that the incorporation of the company in England and the maintaining by it of offices there are merely nominal; that the business of the company and its property interests and management are, in fact, located in and chiefly owned by citizens of the United States; that defendants have continuously since January, 1889, and are now continuing to

carry on a fraudulent agreement and device for the sole
benefit of defendants other than said company, and have
never disclosed to your oratrix, or offered any means to
your oratrix or the other minority stockholders of the said
company of ascertaining, the nature and character of the
true state of said company, and that your oratrix has at
great trouble and expense and many years of effort se-
cured the knowledge of the facts now known to her and
which are herein set forth; that the officers and directors
of the company are: John V. Farwell; Walter Farwell,
an executor of the will of Charles B. Farwell, deceased;
Frank Crisp, Jr., solicitor in England of the company;
George and William Findlay, employees of John V. Far-
well; John Young, chairman of the company; that Crisp
and Young are nominees and under the control of John
V. Farwell, and that no action can be secured to be taken
by such directors against the Farwells; that the Farwells
own and control more than two-thirds of the capital stock
of the company, and it is therefore necessary that appellant
and the other stockholders similarly situate be authorized,
for all the stockholders of said company and in its right
and behalf, to bring and maintain this bill of complaint.
The bill prays that the contracts of July 29, 1892, Febru-
ary 1, 1888, July 12, 1894, and all other contracts made by
the defendants with the Capitol company, whereby they, or
either of them, claim the right to hold the profits and in-
crease of ranches, improvements and cattle of the Capitol
company, may be adjudged to be invalid and unconscion-
able and of no force or effect, and that defendants, other
than the company, be held to the liability of trustees of the
company, and be decreed to account for and pay to and
turn over to the company all of the cattle, lands, improve-
ments and property received at any time under any of said
contracts, together with all profits made thereon, including
compensation for the use and enjoyment thereof, as may be
just and proper, and that John V. Farwell and the estate

of Charles B. Farwell, deceased, may also be required to account for and pay to the company the fair value of 30,000 head of cattle under the obligation of the lease of March 27, 1889, or such number of cattle which, with those actually on the ranch January 1, 1890, shall make 150,000 head, and that they be required to account for and pay to the company such amount as it may have paid upon interest on company debentures of the £1,000,000 issue mentioned in the agreement of June 1, 1885, where such interest was paid exclusive of the net cash profits of the company and resulted in an impairment of its capital; that the amount so required to be re-paid be held to be payable out of or offset by net profits of the company and not out of capital, and such amount be held not to be a debt of the company or payable otherwise than from net profits; that net profits be ascertained by deducting from the fair value of all the company's property and its cash resources the par value of its capital stock and the principal of its unpaid debentures; that all the defendants be enjoined from paying any further interest on debentures except out of net cash profits or from money advanced by defendants, except the company, and that the defendants, except the company, be enjoined from asserting any claim for interest or principal on the debentures held by them and from transferring the same until they have accounted with the company as prayed; that John V. Farwell and the estate of Charles B. Farwell be decreed to account to the company for and surrender to it for cancellation all stock and debentures held by them or at any time received by them, representing or being the profit secured by them out of stocks and debentures acquired by them from Babcock or from Taylor, together with the money or claims to money likewise so acquired; that the last named defendants be further enjoined from using as their own the brands and good will of the company and from advertising and holding themselves out as the owners of the lands, cattle and business, and that ap-

pellant and the other stockholders, in their own right and in the right of and on behalf of the company, may have general relief.

The appellees contend that a court of chancery of this State ought not to take jurisdiction of this suit, because, it is claimed, the controversy relates merely to the internal management of the affairs of a foreign corporation, and the remedy for any wrongs in that regard must be sought in the country in which the corporation was organized. The general rule has been declared by the decisions of many courts and has been stated by text writers to be, that the courts of one State will not exercise the power of deciding controversies relating merely to the internal management of the affairs of a corporation organized under the laws of another State or of determining rights dependent upon such management. *New Haven Horse Shoe Nail Co.* v. *Linden Springs Co.* 142 Mass. 353; *Wason* v. *Buzzell,* 181 id. 338; *Kimball* v. *St. Louis and Santa Fe Railway Co.* 157 id. 7; *Madden* v. *Penn Electric Light Co.* 181 Pa. 617; *McCloskey* v. *Snowden,* 212 id. 249; *Wilkins* v. *Thorne,* 60 Md. 253; *North State Copper and Gold Mining Co.* v. *Field,* 64 id. 154; *Condon* v. *Mutual Reserve Fund Life Ass'n,* 89 id. 99; *Taylor* v. *Mutual Reserve Fund Life Ass'n,* 97 Va. 60; *Clark* v. *Mutual Reserve Fund Life Ass'n,* 14 App. (D. C.) 154; *Howard* v. *Mutual Reserve Fund Life Ass'n,* 125 N. C. 49; *Young* v. *Farwell,* 139 Ill. 326; 6 Thompson on Corporations, secs. 7904, 8011; 3 Clark & Marshall on Corporations, sec. 864; 19 Cyc. 1236.

As stated in Thompson on Corporations, *supra,* this doctrine obviously has its limitations. Except in cases involving the exercise of visitorial powers, the question is not strictly one of jurisdiction but rather of discretion in the exercise of jurisdiction. The reasons which influence courts of chancery to refuse to interfere in the management of the internal affairs of a foreign corporation are, that the

245—3

rights arising between a corporation and its members out of such management depend upon the laws of the State under which the corporation is organized; that the courts of that State afford the most appropriate forum for adjudication upon the relation between the stockholders and the corporation, and that frequently such courts alone possess power adequate, to the enforcement of all decrees that justice may require. It is the inability of the court to do complete justice by its decree, and not its incompetency to decide the question involved, that determines the exercise of its power. The general statement that courts will not interfere with the mangement of the internal affairs of foreign corporations must be construed in connection with the particular facts. The rule rests more on grounds of policy and expediency than on jurisdictional grounds; more on want of power to enforce a decree than on jurisdiction to make it. Where the wrongs complained of are merely against the sovereignty by which the corporation was created or the law of its existence, or are such as require for their redress the exercise of the visitorial powers of the sovereign, or where full jurisdiction of the corporation and of its stockholders is necessary to such redress, the courts will decline jurisdiction. Examples of such cases are suits to dissolve a corporation; to appoint a receiver; to determine the validity of its organization or which of two rival organizations is legal; to restrain it from declaring a dividend or compel it to make one; to restrain an issue of stock or of bonds; to compel a division of its assets; to restore a stockholder to his right to vote at stockholders' meetings from which he has been excluded, or to compel the recognition of one claiming to have been elected a director. But here the relief sought substantially amounts to requiring resident directors of the corporation to restore to it such sums of money as upon an accounting they shall be found to have unlawfully diverted and retained from it. The corporation and all persons necessary to a decree ad-

justing the rights involved in the controversy have appeared in the cause. Such decree as may be rendered will be personal and may be enforced in the ordinary manner.

In *North State Copper and Gold Mining Co.* v. *Field, supra,* it is said: "Where the act complained of affects the complainant solely in his capacity as a member of the corporation, whether it be as a stockholder, director, president or other officer, and is the act of the corporation, whether acting in stockholders' meeting or through its agents, the board of directors, that then such action is the management of the internal affairs of the corporation, and in the case of a foreign corporation our courts will not take jurisdiction. Where, however, the act of a foreign corporation complained of affects the complainant's individual rights, only, then our courts will take jurisdiction whenever the cause of action arises here." So courts have refused, in the cases above cited, to entertain jurisdiction of suits against foreign corporations brought by the stockholders to cancel a lease of the corporate property and reckless and fraudulent contracts made by the directors which depreciated and destroyed the value of the stock; for an accounting of the value of property fraudulently purchased at double its value of the promoters of the corporation; to restrain the defendant, who had taken possession of the corporate property, from refusing to recognize complainant's rights and fraudulently excluding him from participation in the corporate affairs; to restrain the issue of mortgage bonds unless made subordinate to complainant's preferred stock; to restrain the wrongful levy of excessive assessments on a beneficiary certificate in a fraternal benevolent association for the purpose of forcing the complainant's policy to lapse.

Following some of these and similar decisions we would be justified in holding that the courts of this State have no jurisdiction to entertain this suit. But we are not satisfied with the distinction announced in the language just

quoted. If the word "capacity," as there used, is limited
to the meaning of "status," it more nearly expresses the
rule, in our judgment. Acts which affect the relation of
stockholders to one another or to the corporation as indi-
vidual stockholders or as classes of stockholders must be
regarded as acts of internal management of the corpora-
tion, relief against which must be sought in the courts of
the country where the corporation was organized. Where,
however, the relief sought is within the general jurisdic-
tion of a court of chancery, where all the parties necessary
to the full and proper adjustment of the rights involved
are before the court and where the relief sought does not
require the exercise of the visitorial power of the gov-
ernment, we think the court should exercise the power of
determining controversies brought before it instead of re-
mitting suitors to a foreign jurisdiction. Corporations
have become, to a great extent, migratory in their charac-
ter. A corporation may be organized in a State distant
from the field of its actual business and its residence in
the State of its organization may be merely nominal. It
may be more difficult to bring it within the jurisdiction of
the courts and subject it to their decrees in that State than
elsewhere. In many cases, under various circumstances,
the courts have entertained jurisdiction of a suit brought
against a foreign corporation and its directors or agents
to compel the restoration of property misappropriated by
such officers. In such case, though the act complained of
is, in part, that of the corporation itself, and though the
complainant is affected only in his capacity as a stock-
holder, the suit is, in effect, for the benefit of the corpo-
ration itself. The corporation, under such circumstances,
may maintain a suit against its defaulting directors wher-
ever they may be found, and there is no good reason why
a stockholder who seeks to enforce precisely the same rights
in favor of the corporation may not maintain a similar
suit. Accordingly, actions by minority stockholders in for-

eign corporations to redress grievances in corporate management have been sustained where the court has obtained jurisdiction of the persons of the necessary parties and the relief sought could be accomplished by acting directly on the persons of the defendants. (*Wineburgh* v. *United States Steam and Street Railway Advertising Co.* 173 Mass. 60; *Richardson* v. *Clinton Wall Trunk Manf. Co.* 181 id. 580; *Wilson* v. *American Palace Car Co.* 64 N. J. Eq. 534; *Miller* v. *Quincy,* 179 N. Y. 294; *Sloan* v. *Clarkson,* 105 Md. 171; *Watkins* v. *North American Land and Trust Co.* 107 La. 107.) Where minority stockholders seek to have restored to the corporation property fraudulently appropriated to their own use by directors who, together with the corporation itself, are personally subject to the jurisdiction of the court, we think it is the better doctrine that the court should exercise its jurisdiction for the determination of the controversy.

The alleged wrongful acts which constitute the basis of the appellant's claim divide themselves into two classes: those done in the lifetime of Amos C. Babcock, and those occurring since his death. The appellant claims that there should be an accounting for the alleged profit of more than $700,000 made by the Farwells through the purchase of one-half of Babcock's one-fourth interest; for more than $400,000 which it is claimed the Farwells should have advanced to pay interest on the debentures but which they did not advance; for an alleged unpaid balance of £38,693 rent under the lease of March 27, 1889; for 21,741 head of cattle not accounted for under said lease, and for all the profits made under the contract of July 12, 1894. All these matters arose during the life of Mr. Babcock and before the settlement on January 30, 1896, of his suit in the circuit court of Cook county, commenced in 1891. That suit was begun for the purpose of securing the delivery of the 15,000 shares of stock to which Babcock was entitled under the agreement of January 5, 1889, and which the

Farwells had wrongfully obtained, and for an accounting in respect thereto. The Farwells claimed that the stock was subject to a lien for Babcock's share of certain, advances claimed to have been made by them. It did not involve directly any of the matters now under consideration, but after it had been pending for four years, during which some of the acts and contracts now complained of were done and entered into, a settlement was made between the parties, whereby, in consideration of $15,000 paid by the Farwells to Babcock, and of the transfer by the Farwells to William H. Parlin, at Babcock's request, of 10,000 ordinary shares and 10,000 deferred ordinary shares of the Capitol Freehold Land and Investment Company, and of a general release of Babcock from all claims and demands, of whatever kind, of the Farwells against him, Babcock agreed to dismiss all suits against the Farwells, released and discharged them from any and all claims and demands, of every nature, which he might have against them, and particularly waived any objection he might or could have to any and all contracts theretofore entered into between the Capitol Freehold Land and Investment Company and the Farwells and Taylor, and assigned and released to the Farwells any interest he might have therein. Babcock never attacked this settlement in any way. It was a complete ratification of all the transactions between the Farwells and Taylor and the Capitol Freehold Land and Investment Company. By it Babcock waived any right he might have had to object to those transactions, and the contract of settlement stood as a perfect defense to any suit he might have brought for that purpose and stands as an equally good defense to the appellant's suit.

To meet the obvious barrier of the settlement thus made, it is insisted that it was procured by the fraud and concealment of the Farwells in regard to their relations to the company, the true condition of the accounts between them, the contracts actually made and the business con-

ducted under such contracts. No offer has been made to return the $15,000 paid to Babcock, but, on the contrary, the bill avers that the appellant is unable, either personally or as executrix of his will, to do so, or to return the value of the stock received by Babcock in the settlement, and to seek for her own benefit, or the benefit of the estate of said A. C. Babcock, the rescission of the settlement of 1896, but only as a holder of the stock of the company and in its right and behalf, for the benefit of all of the stockholders of said company. The appellant insists that the Farwells should be held to account to the company as trustees. This statement seems to concede that the appellant has no right to maintain the suit on her own account without a rescission of the contract of settlement and a restoration of the consideration, and whether conceded or not, this position is in accordance with the law. If a party accepts the provisions of a contract which are of advantage to him, he will be bound by the provisions which purport to be obligatory on him. If a right to rescind exists, it must be exercised *in toto*. The contract must stand in all its provisions or fall altogether. A party to a contract cannot retain the consideration or a part of it, and refuse to be bound by the contract or a part of it. (*Kellogg* v. *Turpie*, 93 Ill. 265; *Bollnow* v. *Novaceck*, 184 id. 463.) The inability of the party to restore the consideration will not relieve him from the necessity of doing so, and it is not sufficient to offer to set off the amount against what is claimed from the other party. (*Rigdon* v. *Walcott*, 141 Ill. 649; *Mortimer* v. *McMullen*, 202 id. 413; *Dunbar* v. *American Telephone and Telegraph Co.* 224 id. 9.) In this connection no question arises in regard to the relation of trustee and *cestui que trust* or the burden of proof. Whatever may be the relation or on whatever party may rest the burden of proof, the right of rescission of a contract can be exercised only upon a return of the consideration, which must be alleged in the bill.

It is insisted on behalf of appellant that it is not neces-
sary, in order to avoid a release obtained by actual fraud,
to return the consideration therefor.   This is true where
the fraud was in procuring the execution of the release,—
that is, where the party was induced to execute the instru-
ment not knowing it to be a release but believing it to be
an instrument of a different character.   A release so ob-
tained is void.   (*Indiana, Decatur and Western Railway
Co.* v. *Fowler,* 201 Ill. 152.)   The doctrine has no appli-
cation to a case where there was fraud only in the consid-
eration, as where the party knew that he was executing a
release but was induced to do so by the false representa-
tions of the other party as to matters other than the char-
acter of the instrument.   In this latter case the release so
obtained is not void but is voidable only, and until set aside
in equity is binding on the party executing it.   (*Rigdon*
v. *Walcott, supra; Papke* v. *Hammond Co.* 192 Ill. 631;
*George* v. *Tate,* 102 U. S. 564.)   In the former case no
contract was entered into.   The release was not the deed
of the party signing it, because it was not knowingly exe-
cuted by him.   It was void and no necessity existed for
setting it aside.   It might be disregarded· anywhere.   In
the latter case a contract was knowingly entered into.   The
party intended to execute the very contract he did execute.
He can be relieved from it only on the equitable principles
which apply to all contracts and require the restoration of
the consideration before their rescission.

Since Babcock could not himself have maintained the
suit in his personal capacity, neither could his executor,
nor appellant as his legatee.   By expressly waiving his ob-
jections to the transactions now complained of, he debarred
himself from seeking relief against them in his own right.
He could not, therefore, indirectly obtain such relief by
bringing suit in the right of the corporation or of other
stockholders.   A complainant cannot maintain a bill and
obtain relief unless he has himself sustained a wrong.   The

theory of a stockholder's suit is, that the stockholder has sustained a wrong through the injurious effect upon his stock of the wrong done to the corporation. If he has himself consented to or participated in the acts constituting such wrong, or has waived his right to object to them, he cannot afterwards maintain a bill, on account of such transactions, for the benefit of the corporation or of other stockholders. (*Burt* v. *British Ass'n,* 4 DeG. & J. 158; *Brown* v. *DeYoung,* 167 Ill. 549; *Wells* v. *Northern Trust Co.* 195 id. 288.) Neither can an assignee of stock maintain a suit in regard to transactions with the corporation done or assented to by his assignor. The purchaser of shares of stock acquires no greater rights than his vendor. He holds by the same title and subject to the same liability. Shares of stock are merely choses in action, and the successive owners acquire only the rights held by their predecessors in title. *Home Ins. Co.* v. *Barber,* 67 Neb. 644; *Venner* v. *Atchison, Topeka and Santa Fe Railroad Co.* 28 Fed. Rep. 581; *Church* v. *Citizen's Railroad Co.* 78 id. 526.

The appellant concedes that if Babcock, with full knowledge, expressly ratified the contract of July 12, 1894, by the settlement of January 30, 1896, and thereby estopped himself from attacking such contract, the appellant is also estopped. She insists, however, that the general terms of the waiver contained in the settlement do not apply to the contract of July 12, 1894, because Babcock never knew of that contract and it was fraudulently concealed from him. Estoppel is not the proper term to apply to the effect of the contract of settlement. That contract was an express agreement of ratification,—an express waiver of objection. It did not take effect by way of estoppel but by direct and express agreement. Its operation was directly binding upon Babcock unless rescinded.

In regard to Babcock's knowledge of the contract of July 12, 1894, it is averred that he never knew of it. It appears, however, from the bill that on March 25, 1895,

he filed in the suit in Cook county a supplemental bill, in which he set out a copy of the draft of an agreement of February 6, 1894, which has been before referred to. This draft in all substantial particulars was equivalent to the contract of July 12, 1894. So far as the two differ, the changes in the contract actually executed were not to the disadvantage of the corporation. Babcock had knowledge of the unsigned draft of February 6, 1894. Whatever objections he may have had to the terms contained therein he was willing to waive. Though the form of the contract differed from the draft, it did so in no essential particular. Though Babcock had no actual knowledge of that particular contract, he knew that a contract in substantially the same terms existed, and the settlement must be regarded as having been made with it in view and as applying to it.

After Babcock's death Taylor and Charles B. Farwell died in 1903, and appellant insists that by their death the contract of July 12, 1894, was terminated, and that the defendants have taken the profits of the business of the company since that date without right and should be required to account therefor. We have already seen that the appellant is in no position to complain of the making of that contract, and the complaint now under consideration, conceding the contract to be valid and binding, goes upon the theory that it was merely a contract of agency, which was terminated by the death of two of the then joint agents.

It is further contended that whatever view may be taken of the nature of the contract, the services contracted for were of so personal a nature that the contract would necessarily terminate by the death of two of those persons by whom the services were to be performed. On the other hand, it is contended that the contract was in substance a lease of the ranches, with the cattle on them. Whether the contract amounted to a lease or not, it seems clear that it was more than the creation of an agency. At the time it

was entered into, the syndicate was claiming a large indebtedness from the company and the company a smaller amount from the syndicate. The syndicate was liable for a large amount by reason of its guaranty of the interest on the company's debentures, and was in possession of the company's ranches and property under a contract to conduct the cattle business for the reimbursement of its advances. By this contract the respective claims of the parties against one another were released and the snydicate continued in possession of the ranches and other property, with the right to receive the proceeds of the business carried on in satisfaction of the expenses of such business, the expenses of the company and the interest on the debentures, all of which the syndicate was bound to pay.

It is contended by the appellant that the indebtedness claimed by the syndicate was fictitious and the claim fraudulent; that the amount claimed by the company was justly due to it from the syndicate; that the business on the ranches was conducted at a large profit above all expenses and the debenture interest, and that the making of the contract was not only unwise and unjust to the company but was fraudulent on the part of the directors, and knowingly done for the purpose of enabling the syndicate to absorb the profits of the company. We have, however, already held that Babcock could make no complaint about the contract and that the appellant is in no better position. Since appellant is precluded from raising the objection of fraud we cannot inquire into the character of the contract, but must assume that it was fairly entered into for a valuable consideration and is binding on the company.

It is a well known rule of law that a naked power committed to several persons is determined by the death of one, but if coupled with an interest the power, even though discretionary, passes to the survivor. (1 Perry on Trusts,—3d ed.—sec. 414.) Here the syndicate was entitled to the possession of the real estate and the personal property for

a term of years ending on December 31, 1907, to enable it to realize from the use thereof, in the manner mentioned in the contract, satisfaction of the compromise claims of the parties and indemnity against the sums agreed to be paid by the syndicate from interest and expenses. Being entitled to the exclusive use and possession of the property as security and in compromise of their claim of indebtedness, the members of the syndicate had an interest in the property with which the power was coupled, and upon the successive deaths of Taylor and Charles B. Farwell the power passed to the survivor, John V. Farwell.

Whether or not the contract was of such a character as to require the personal service of all the three joint contractors in its performance and to be terminated by the death of one or of two of them is to be determined by a construction of the contract itself and depends upon the intention of the parties. The question is not whether the rights and obligations of the contract devolve upon an administrator, but whether they survive to and against the surviving joint contractors. The general rule is, that upon the death of one of several joint contractors before complete performance of the contract, the survivors are bound by the obligations of the contract and entitled to its benefit. (*Maynard* v. *Richards,* 166 Ill. 466.) There is nothing in the nature of this contract or the relation of the parties to lead to the supposition that it was intended by the parties to take it out of the general rule. The members of the syndicate could not be relieved of their obligation to third parties, the holders of the debentures. The estates of those who died, as well as the survivors, were bound for the debenture interest for the full term and could not be relieved from it. The claims of the syndicate against the company had been released, security had been given on account of the syndicate's guaranty of the interest, and it is not to be believed that it was the intention of the parties that the death of one or two of the syndicate immediately after the

execution of the contract should end it, and leave the survivors, as well as the estate of the deceased member, liable for the interest guaranteed to the end of the term but without the indemnity of the contract.

It is alleged in the bill that, beginning about the year 1900, the syndicate proceeded recklessly to sell large quantities of the land of the company at prices largely below the cost thereof and to apply the proceeds of such sale to the redemption of the debentures, the interest upon which was guaranteed by the syndicate; that the Farwells have so conducted the ranch and cattle business as to cause the ranch to be known as Farwell's ranch, the cattle as Farwell's cattle and the brand as Farwell's "X.I.T." brand, and they have thus diverted to themselves the name and good will of the business of the company; that the syndicate has paid out of the treasury of the company, and wrongfully charged to it, the expenses of a ranch in Montana used for the sole benefit of keeping cattle for the profits of the syndicate; and that the syndicate has allowed third persons to range cattle, other than those of the company, on its ranches, and has received large sums therefor without accounting to the company. To say nothing of other objections which may be urged to the sufficiency of the averments of the bill to entitle the appellant to relief in respect to those matters, it may be said that, except with reference to cattle brands and good will of the company, no mention is made of any of those supposed causes for complaint in the demand made by the appellant upon the directors of the company that they proceed to take the proper action to secure the rights of the company against the syndicate. The matters there mentioned as requiring the attention of the directors were the contract of July 12, 1894, and precedent contracts, and the appropriation of the brands and good will of the company. If the averments of the bill were sufficient to show a right of action in the company in regard to the sales of the land, the Montana

ranch and the ranging of cattle, it does not follow that they are sufficient to enable the appellant to maintain this bill. The stockholders cannot ordinarily maintain a suit to enforce any right of the corporation. That privilege belongs to the corporation itself, acting through its directors. The mere failure of the directors to bring suit does not entitle any stockholder to do so. A demand upon the directors to bring the suit is, in general, essential before a stockholder may himself maintain a bill. His remedy must first be sought within the corporation, and it is only where the majority of the directors are themselves involved in the matters complained of, so that it is evident that the demand would be unavailing, that it can be dispensed with. Though the directors refused to accede to the demand that they seek to obtain a cancellation of the contract mentioned, there are no facts alleged from which it may be inferred that they would not seek redress from the breach of the contract, for a failure to account under it or for a fraudulent diversion of the funds of the corporation. So far as the appropriation of the cattle brand and good will of the company is concerned, no injury, present or prospective, to its rights is shown. The attachment of the name of Farwell to the ranch brand or cattle is not shown to be injurious and is certainly not necessarily so. On the contrary, the retention of the name at the expiration of the contract may be a benefit to the corporation. It can not be said that the refusal of the directors to institute a suit to prevent the use of the name in the business conducted under the contract was fraudulent or opposed to the interest of the corporation.

We are of the opinion that the demurrer to the bill was properly sustained, and the judgment of the Appellate Court will therefore be affirmed.        *Judgment affirmed.*

FARMER, C. J., and VICKERS and COOKE, JJ., dissenting.